UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, AND ALLSTATE COUNTY MUTUAL INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> GREATER HOUSTON HEALTHCARE SOLUTIONS, PLLC, MAGBAG WELLNESS AND REHAB, P.A., MAGBAG CHIROPRACTIC EAST, P.A., BRAIN DIAGNOSTICS OF TEXAS LLC, JOSE SEBASTIAN MAGBAG, JR., D.C., ALAN DINH TRAN, M.D, AND VI YEN CHAU-TRAN, APRN-CNP, <br><br> Defendants. | C.A. No.: ___ |

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate County Mutual Insurance Company (collectively, "Allstate" and/or "Plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink, P.C., allege as follows:

## I.   INTRODUCTION

1.       Greater Houston Healthcare Solutions, PLLC ("GHHS"), Magbag Wellness and Rehab, P.A. ("Magbag Wellness"), Magbag Chiropractic East, P.A. ("Magbag East"), Brain Diagnostics of Texas LLC ("Brain Diagnostics") (hereinafter collectively referred to as the "Defendant businesses"), Jose Sebastian Magbag, Jr., D.C. ("Dr. Magbag"), Vi Yen Chua-Tran,

1

APRN-CNP ("Vi Tran") and Alan Dinh Tran, M.D. ("Dr. Alan Tran") (hereinafter collectively referred to as the (hereinafter collectively referred to as the "Defendants""), devised and executed a scheme to defraud Allstate by submitting and causing to submit[1] false and fraudulent records and bills ("false medical documentation") for unnecessary medical services purportedly provided to motor vehicle accident victims (also referred to herein as "Allstate claimants"), through the U.S. Mail seeking to collect payment from Allstate.

2.      The scheme illustrated below, was intentionally initiated, promoted, financed, operated and/or maintained by the Defendants.

3.      The Defendants' scheme involved intentional fraudulent conduct, including:

   a.   Unlawful ownership and control over GHHS and Brain Diagnostics;

   b.   Billing for services that were rendered pursuant to an improper unlawful fee-splitting and patient referral arrangements involving illegal kickback payments;

   c.   Billing for services where unlicensed and unqualified laypersons made medical decisions and improperly performed healthcare services (including consultations, treatment, diagnosis, and procedures) for Allstate claimants;[2]

   d.   Billing for healthcare services that were neither medically reasonable nor necessary;

   e.   Billing pursuant to a predetermined treatment protocol regardless of the Allstate claimants' individual medical needs;

   f.   Billing for grossly inflated medical services; and

   g.   Billing for services that were not rendered as represented.

---

[1] The Defendants submitted or caused to be submitted to Allstate false medical documentation through the U.S. Mail. The phrase "submitted or caused to be submitted" will be shortened to "submitted" throughout this Complaint.

[2] The term "healthcare services" shall include medical and chiropractic consultations, treatment, procedures, and related services.

4.      The Defendants deliberately targeted Allstate as their primary victim. They meticulously calculated that Allstate would bear the ultimate financial burden for its claimants' medical bills by paying out insurance benefits on motor vehicle accident claims. This strategic targeting was evidenced by their near-exclusive focus on individuals involved in minor motor vehicle accidents, precisely because they anticipated Allstate's reimbursement.

5.      Dr. Magbag has admitted under oath himself that more than ninety percent of the patients at GHHS and Magbag Wellness were personal injury plaintiffs, involved in motor vehicle accidents.

6.      A true and accurate excerpt from Dr. Magbag's deposition is depicted below.

```
25            The -- what percentage of Greater Houston

                                        Page 84

1    Healthcare Solutions' patients are personal injury
2    claimants or plaintiffs?
3        A.  I would say a pretty high percent.
4        Q.  Okay.  Like, more than 75?
5        A.  Yes.
6        Q.  More than 90?
7        A.  Yes.
8        Q.  Okay.  And is that accurate?  Are those --
9    that -- is it more than 90 percent, or would it be
10   accurate to say that more -- 90 percent or more of the
11   patients at Magbag Wellness and Rehab are also car
12   accident or other personal injury claimants?
13       A.  Yes.
```

7.      The Defendants abused the insurance coverage of Allstate claimants by billing for healthcare services that the Defendants had no legal right to collect.

8.     The Defendants intentionally siphoned away payments from the proceeds of the insurance monies paid by Allstate to resolve Allstate claimants' medical expense and bodily-injury claims.

9.     The insurance fraud scheme perpetrated by the Defendants was designed to, and did in fact, result in payments from Allstate to and for the benefit of the Defendants.

10.     The Defendants mailed false medical documentation to Allstate claimants and/or their personal injury attorneys, knowing that these documents would then be mailed to Allstate in support of the Allstate claimants' medical expense and bodily-injury claims. In turn, the Defendants caused Allstate claimants and/or their attorneys to mail the false medical documentation directly to Allstate.

11.     The Defendants intended for Allstate to rely on the representations made in the Defendants' records and bills when determining whether to pay medical expense and bodily-injury claims.

12.     Allstate justifiably and detrimentally relied upon the Defendants' false medical documentation in evaluating insurance claims.

13.     In all cases, Allstate reasonably relied upon the Defendants' false medical documentation, and the misrepresentations and omissions of material fact contained therein concerning (1) unlawful referrals and kickbacks; (2) unauthorized or layperson control of medical decision-making; (3) unnecessary healthcare services provided pursuant to a predetermined treatment protocol at grossly excessive charges; and (4) billing for services that were not rendered as represented.

14.    At the time Allstate made payments, it was not aware of the Defendants' fraudulent scheme, despite its due diligence. Had Allstate known about the Defendants' fraudulent scheme, Allstate would not have issued payments for the services purportedly rendered.

15.    Allstate made payments on these claims in direct reliance on the medical documentation created by the Defendants, which were false and/or based on unlawful services.

16.    As a result of the Defendants' unlawful and fraudulent acts, Allstate has paid over one million dollars to resolve insurance claims that were based on the fraudulent records and misrepresentations in medical documentation submitted by or on behalf of the Defendants.

17.    Allstate made payments to the Defendants, and Allstate was also caused to make payments in connection with bodily-injury claims presented by the Allstate claimants, which collectively total more than $1,438,170.99 (the exact amount to be determined at trial).

18.    By this Complaint, Allstate asserts claims against the Defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common law fraud; (c) civil conspiracy to commit fraud; and (d) restitution of money had and received.

19.    Allstate also seeks declaratory relief that no pending claims submitted to it by, or on behalf of, the Defendants, GHHS, Magbag Wellness, Magbag East, and Brain Diagnostics are compensable.

## II.    THE PARTIES

### A.    PLAINTIFFS

20.    Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company, are corporations

duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

21.     Allstate County Mutual Insurance Company is a corporation duly organized and existing under the laws of the State of Texas, having its principal place of business in Irving, Texas.

22.     At all relevant times to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate County Mutual Insurance Company were each authorized to conduct business in Texas.

**B.**     **DEFENDANTS**

**1.**     **Medical Corporation Defendants**

**a.**     ***Greater Houston Healthcare Solutions, PLLC***

23.     GHHS was organized under the laws of the State of Texas in 2016.

24.     GHHS' registered address is 10723 Schroeder Oak Ct, Houston, TX 77070, which is also Magbag Wellness' and Brain Diagnostics' mailing address and principal place of business.

25.     On its website, GHHS purports to have several practice locations in addition to its main practice location of 10723 Schroeder Oak Ct, including:

- 2626 S Loop W #115, Houston, TX 77054;

- 654 N. Sam Houston Pkwy East, Suite 128, Houston, TX 77060;

- 11999 Katy FWY, Suite 375, Houston, TX 77079;

- 900 Rockmead St, Ste 114, Kingwood, TX 77339;

- 2743 Smith Ranch Rd, Suite 1301, Pearland, TX 77584;

- 9555 W Sam Houston Pkwy S, Suite 400, Houston, TX 77099; and

- 2261 Brookhollow Plaza, Suite 303, Arlington, TX 76006.

6

26.     Dr. Magbag incorporated and was the sole owner of GHHS from 2016 until 2022.

27.     Dr. Magbag is a licensed Chiropractor in Texas.  He is not a licensed medical doctor.

28.     Dr. Magbag operated, managed, and oversaw the medical, business, and administrative practices carried out at GHHS.

29.     As a chiropractor, Dr. Magbag may not lawfully own or operate medical facilities, such as GHHS, that provide services beyond chiropractic treatment.

30.     GHHS markets itself as a personal injury medical consulting clinic.

31.     The services purportedly provided at GHHS do not relate to chiropractic services; instead, they include general medical evaluations, primary care consultations, prescribing medications, making referrals for X-rays, MRIs, electroencephalograms ("EEGs") (a medical test that measures the electrical activity of the brain by placing electrodes on the scalp), neurophysiological testing, and administering TPIs

32.     Dr. Alan Tran was purportedly the Medical Director of GHHS from 2022 until December 2024.

33.     Angelo Dushi Parameswaran, M.D. ("Dr. Angelo") is purportedly the Medical Director and managing member at GHHS since 2025.

34.     Vi Tran is employed at GHHS as a nurse practitioner, though she represents herself as an independent contractor, who provides medical services such as general medical evaluations, primary care consultations, prescribing medications, making referrals for X-rays, MRIs, EEGs, neurophysiological testing, and administering TPIs.

35.     Vi Tran created records and invoices for services purportedly rendered to Allstate claimants, intending to prove to Allstate and others that these services were performed and were medically necessary.

36.     Vi Tran also performed administrative and managerial tasks in addition to providing medical services at GHHS.

37.     The operations of GHHS are based on an unlawful scheme, which was unknown to Allstate when payments were issued.

38.     The records and invoices of GHHS contained material misrepresentations and deficiencies that were relied upon by Allstate when issuing payments.

39.     Due to their ownership and/or control over GHHS, Dr. Magbag, Dr. Alan Tran, and Vi Tran are responsible for the unlawful, medically unnecessary, and unreasonably charged services billed by GHHS in connection with Allstate claimants.

**b.      *Magbag Wellness and Rehab, P.A.***

40.     Magbag Wellness was organized under the laws of the State of Texas in 2014.

41.     Magbag Wellness is a chiropractic clinic, with its registered address at 12210 Marcrest Ct., Houston, TX 77070.

42.     Magbag Wellness' principal place of business is 10723 Schroeder Oak Ct, Houston, TX 77070, which is also GHHS' registered address and Brain Diagnostics' principal place of business.

43.     Dr. Magbag incorporated and has remained the owner of Magbag Wellness.

44.     Dr. Magbag currently serves as the CEO of Magbag Wellness.

45.     Dr. Magbag instructed Vi Tran, and other nurse practitioners employed at GHHS to refer patients to Magbag Wellness.

46.     Razak Abayomi Balogun, D.C. ("Dr. Balogun") and Justin Delane Dudycha, D.C. ("Dr. Dudycha") currently serve as employees and are the primary chiropractors at Magbag Wellness.

47.     Dr. Balogun and Dr. Dudycha purportedly treated Allstate claimants at Magbag Wellness.

48.     Dr. Magbag instructed Dr. Balogun and Dr. Dudycha to create and falsify records and invoices for the services they purportedly rendered to Allstate claimants to prove to Allstate and others that the services were legitimate and medically necessary.

49.     As part of the scheme, Magbag Wellness billed the Allstate claimants at issue in this Complaint for unlawful, misrepresented, fraudulent, and or unnecessary healthcare services.

50.     The operations of Magbag Wellness are based on an unlawful scheme, which was unknown to Allstate when payments were issued.

51.     The records and invoices of Magbag Wellness were fraudulent and contained material misrepresentations and deficiencies that were relied upon by Allstate when issuing payments.

52.     Due to his ownership and/or control over Magbag Wellness, Dr. Magbag is responsible for the fraudulent, unlawful, medically unnecessary, and exuberantly priced services billed by Brain Diagnostics in connection with Allstate claimants.

### c.     *Magbag Chiropractic East, P.A.*

53.     Magbag East was organized under the laws of the State of Texas in 2016.

54.     Dr. Magbag incorporated and remains the owner of Magbag East.

55.     Magbag East's registered address is 12210 Marcrest Ct., Houston, TX 77070.

56.     Magbag East's principal place of business is 12747 East Freeway, TX 77015.

57.    Dr. Magbag currently serves as the Manager of Magbag East.

58.    Dr. Magbag instructed Vi Tran and other nurse practitioners employed at GHHS to refer patients to Magbag Wellness.

59.    Dr. Balogun and Dr. Dudycha currently serve as employees and are the primary chiropractors at Magbag East.

60.    Notably, Dr. Balogun has been previously sanctioned by the Texas Board of Chiropractic Examiners ("TBC") on three occasions. Although the sanctioned activities of Dr. Balogun are not directly related to the current scheme, they demonstrate a history and pattern of Dr. Balogun's unlawful practices to defraud insurance companies:

(i)    In November 2011, Dr. Balogun was sanctioned for operating a chiropractic facility (namely, Dr. Balogun and James Wellness) without a certificate of registration;

(ii)    In February 2017, Dr. Balogun was sanctioned for engaging in fraud and in grossly unprofessional conduct likely to deceive or defraud the public. Specifically, Dr. Balogun and his business partner, James, simultaneously listed each other as "unable to work," then treated each other within that duration to fraudulently seek disability payments from AFLAC Insurance; and

(iii)    In November 2017, Dr. Balogun was sanctioned for failing to pass the ethics exam required under the previous sanction, not informing the board of the failure to do so, and failing to respond to the Board's request about his practice.

61.    Dr. Balogun and Dr. Dudycha purportedly treated Allstate claimants at Magbag East.

62.    Dr. Magbag instructed Dr. Balogun and Dr. Dudycha to create and falsify records and invoices for the services that they purportedly rendered to Allstate claimants to prove to Allstate and others that the services took place and were medically necessary.

63.     As part of this scheme, Magbag East billed Allstate claimants at issue in this Complaint for unlawful, misrepresented, fraudulent, and or unnecessary healthcare services.

64.     The operations of Magbag East are based on an unlawful scheme, which was unknown to Allstate when payments were issued.

65.     The records and invoices of Magbag East were fraudulent and contained material misrepresentations and deficiencies that were relied upon by Allstate when issuing payments.

66.     Due to their ownership and/or control over Magbag East, Dr. Magbag and Vi Tran are responsible for the fraudulent, unlawful, medically unnecessary, and exuberantly priced services billed by Magbag East in connection with Allstate claimants.

### d.     *Brain Diagnostics of Texas LLC*

67.     Brain Diagnostics was organized under the laws of the State of Texas in 2023.

68.     Brain Diagnostics registered address is 10723 Schroeder Oak Ct, Houston, TX 77070, which is also GHHS' and Magbag Wellness' registered and principal place of business, respectively.

69.     Dr. Magbag incorporated and remains the owner of Brain Diagnostics.

70.     Dr. Angelo is purportedly the managing member at Brain Diagnostics.

71.     Brain Diagnostics markets itself as an early traumatic brain injury and concussion detection clinic.

72.     Dr. Magbag instructed Vi Tran, and other nurse practitioners to refer patients to Brain Diagnostics.

73.     Dr. Magbag purported to personally perform EEG and neurophysiological tests on patients, including Allstate claimants, at Brain Diagnostics.

74.    Dr. Magbag created records and invoices for the services he purportedly rendered to Allstate claimants to prove to Allstate and others that the services took place and were medically necessary.

75.    As part of this scheme, Brain Diagnostics billed Allstate claimants at issue in this Complaint for unlawful, misrepresented, fraudulent, and/or unnecessary healthcare services.

76.    The operations of Brain Diagnostics are based on an unlawful scheme, which was unknown to Allstate when payments were issued.

77.    The records and invoices of Brain Diagnostics contained material misrepresentations and deficiencies that were relied upon by Allstate when issuing payments.

78.    Due to their ownership and control over Brain Diagnostics, Dr. Magbag and Vi Tran are responsible for the unlawful, medically unnecessary, and exorbitantly priced services billed by Brain Diagnostics in connection with Allstate claimants.

### 2.    Medical Provider Defendants

#### a.    *Jose Sebastian Magbag, Jr., D.C.*

79.    Dr. Magbag is a resident and citizen of the State of Texas.

80.    Dr. Magbag is a licensed chiropractor in the State of Texas.

81.    Dr. Magbag has continuously owned and operated GHHS, Magbag Wellness, Magbag East, and Brain Diagnostics throughout the relevant period.

82.    Dr. Magbag is the architect of the fraudulent and racketeering scheme designed to defraud Allstate through the Defendants' association with the Defendant businesses.

83.    Dr. Magbag's history of unscrupulous medical practices and his pattern of seeking monetary gains through improper means are well-established by prior disciplinary actions from

the TBC. These prior findings, though not part of the immediate scheme, are indicative of Dr.

Magbag's modus operandi and include:

    (i)    A 2008 finding by the TBC that Dr. Magbag engaged in the unauthorized practice of chiropractic medicine with an expired license.

    (ii)    A 2008 TBC finding that Dr. Magbag improperly used untrained and non-certified individuals to analyze electromyography (EMG) results, upon which he relied to determine patient treatment and seek reimbursement, thereby compromising patient care for financial advantage.

    (iii)    A 2013 TBC finding that Dr. Magbag operated an unregistered chiropractic facility under the name C&M Wellness & Rehab, further evidencing his disregard for established chiropractic and billing regulations.

84.    Dr. Magbag worked at all of the Defendant businesses, including being frequently present at the 10723 Schroeder Oak Ct, Houston, TX 77070 location during the relevant period.

85.    Brain Diagnostics unlawfully billed for testing by Dr. Magbag on Allstate claimants.

86.    Dr. Magbag billed and created records regarding Brain Diagnostics services that were unlawful, unreasonable, and medically unnecessary.

87.    As the individual with an ownership interest in the Defendant businesses, Dr. Magbag perpetrated unlawful and medically unnecessary self-referrals of Allstate claimants, deliberately failing to disclose this inherent conflict to Allstate or the claimants.

88.    Due to his ownership and direct participation in the operation and management of the Defendant businesses, Dr. Magbag is responsible for the fraudulent, unlawful, medically unnecessary, and unreasonably charged services rendered to Allstate claimants. Dr. Magbag is thus jointly and severally liable for the payments that Allstate was wrongfully induced to make in connection with billing submitted by the Defendant businesses.

b.    ***Alan Dinh Tran, M.D.***

89.    Dr. Alan Tran is a resident and citizen of the State of Texas.

90.    Dr. Alan Tran is a medical doctor licensed in the State of Texas.

91.    Dr. Alan Tran was represented to be a partial owner of GHHS from 2016 to 2024.

92.    Dr. Magbag testified that Dr. Alan Tran did not have an ownership interest in GHHS until 2022.

93.    Dr. Alan Tran was presented as the Medical Director of GHHS from 2016 until 2024. A Medical Director in Texas holds significant administrative and clinical oversight roles. These responsibilities often include:

- Developing, implementing, and enforcing clinical policies, procedures, and protocols to ensure high-quality patient care and compliance with state and federal regulations (like those from the Texas Medical Board).
- Overseeing and supervising all clinical staff, including physicians, physician assistants, and advanced practice registered nurses. This often involves ensuring that all clinical staff are properly licensed, credentialed, and operating within their legal scope of practice.
- Participating in the organization's strategic planning as it relates to clinical services and patient outcomes.
- Ensuring the facility is compliant with all relevant laws, licensing requirements, and ethical standards. This includes oversight of patient safety initiatives and risk reduction strategies.

94.    Dr. Alan Tran did not provide any of the aforementioned oversight.

95.    Dr. Alan Tran was purportedly the supervising physician for several nurse practitioners at GHHS until 2024. However, Dr. Alan Tran never practiced medicine at GHHS.

96.    By purporting to be a partial owner, Medical Director, and/or supervising physician at GHHS, Dr. Alan Tran lent an air of legitimacy that enabled the unlawful, unreasonable, and medically unnecessary services by GHHS to proliferate. Dr. Alan Tran was the Medical Director in name only.

97.     As the nominal owner and Medical Director of GHHS, he had direct participation through his sham ownership and purported supervision of nurse practitioners at GHHS. As such, Dr. Alan Tran is responsible for the fraudulent, unlawful, medically unnecessary, and unreasonably charged services rendered to Allstate claimants. Dr. Alan Tran is thus jointly and severally liable for the payments Allstate was wrongfully induced to make to GHHS.

### c.    _Vi Yen Chau-Tran, APRN-CNP_

98.     Vi Tran is a resident and citizen of the State of Texas.

99.     Vi Tran is an advance nurse practitioner licensed in the State of Texas.

100.    Vi Tran provided medical consultations, prescribed pain medications, made referrals for X-ray, MRI, EEG, neurophysiological testing, chiropractic therapy, and administered TPIs at GHHS.

101.    Vi Tran practiced at GHHS from 2019 without adequate delegation and/or supervision, as Texas Medical Board records indicate she was not granted prescriptive authority at any GHHS location until 2023.

102.    The only recorded delegation from Dr. Alan Tran to Vi Tran was at a separate, unrelated practice, contradicting her claim that Dr. Alan Tran was her supervisor at GHHS.

103.    Vi Tran provided administrative and managerial services at GHHS in addition to providing medical services.

104.    A true and accurate excerpt from Defendant, Vi Tran's deposition in which she disclosed her management role at GHHS, is depicted below:

```
20              And have your responsibilities and duties
21      for Greater Houston changed at all over the course of
22      the five years that you've worked there?
23          A.  Yes.
24          Q.  How so?
25          A.  I help out with scheduling, administration
```

*    *    *

```
16          Q.  And when you say you help out with scheduling
17      and administration work, what does that entail?
18          A.  We have various providers with different
19      locations.  I handle scheduling, make sure that everyone
20      is where they are -- just kind of maneuvering patients
21      depending on where they live, kind of just navigating
22      all of that scheduling with the providers and our
23      clinics.
```

105.    Moreover, Vi Tran profited from the revenue generated by the GHHS enterprise.

106.    Vi Tran created records and bills on behalf of GHHS for unlawful, fraudulent, medically unnecessary, and excessively priced services rendered to Allstate claimants at GHHS. These services were based on a predetermined treatment protocol, rather than an individualized treatment plan required to meet the Allstate claimants' specific needs.

107.    Vi Tran unlawfully and medically unnecessarily referred Allstate claimants from GHHS to Brain Diagnostics, Magbag Wellness, and Magbag East.

108.    Vi Tran prescribed medically unnecessary pain medication to Allstate claimants through GHHS based on a predetermined treatment protocol, rather than an individualized treatment plan required to meet the Allstate claimants' needs.

109. Vi Tran administered TPIs to Allstate claimants at and through GHHS that were medically unnecessary and based on a predetermined treatment protocol, rather than an individualized treatment plan required to meet the Allstate claimants' needs.

110. Due to her direct participation in the operation, management, and services purportedly rendered at GHHS, Vi Tran is responsible for the fraudulent and unlawful services rendered to Allstate claimants, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to GHHS. Vi Tran is also jointly and severally liable for the payments that Allstate was wrongfully induced to make to each of the other Defendant businesses.

## III.　JURISDICTION AND VENUE

111. Jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331.

112. Supplemental jurisdiction over the Plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1967.

113. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the majority of the acts at issue in this Complaint occurred in the Southern District of Texas.

## IV.　FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.　IMPACT OF DEFENDANTS' SCHEME TO DEFRAUD ON ALLSTATE

114. Allstate insures motor vehicles in the State of Texas.

115. Providers of healthcare services routinely submitted invoices in connection with bodily-injury claims made by Allstate claimants.

116. The Defendants billed Allstate for fraudulent services (described throughout this Complaint) directly (First-Party Claims) or billed Allstate claimants (Third-Party Claims), who

then (directly or through their attorneys) submitted those bills through the U.S. Mail to Allstate under applicable insurance policies.

117.    The Defendants also developed and maintained business relationships with personal injury attorneys, the purpose of which was to secure patient referrals to the Defendant businesses.

118.    In exchange for these referrals, the Individual Defendants, through the Defendant businesses, agreed to examine and treat the personal injury attorneys' clients—who were Allstate claimants—under a Letter of Protection ("LOP"). An LOP is an agreement by a patient's attorney promising to pay for medical services from the proceeds of a future settlement of a bodily injury claim with insurance carriers, such as Allstate.

119.    The Defendants charged the Allstate claimants for services at exorbitant rates under the LOP, with the understanding that the billed rates would be substantially reduced after a settlement was reached. The medical services which were provided, however, were not reasonable or necessary for the claimants' injuries. Consequently, any amount acquired from the Allstate claimants' settlement constituted profit derived from a fraudulent scheme.

120.    In making its decision on a settlement, Allstate considered all bills submitted from any and all providers, whether or not they were from the Defendant businesses. Allstate would then decide how much to settle the claim based on all the bills submitted.

121.    Had Allstate known of the fraud discussed herein at the time the applicable settlements were made, and payments were issued, it would not have issued any money toward a settlement that recognized the services and bills submitted by the Individual Defendants through the Defendant businesses.

122.    After a settlement was reached between Allstate and/or the Allstate claimants, Allstate issued payments to the Allstate claimants or their attorneys. The attorneys would then issue payments to the Defendant businesses via checks drawn from their IOLTA accounts to satisfy the LOP. These checks were submitted for each claim via the U.S. Mail.

123.    The LOP payment structure for Third-Party Claims was a key component of the fraudulent scheme, designed to conceal the Defendants' direct fraudulent conduct from Allstate. By routing payments through the personal injury attorneys' IOLTA accounts, the Defendants could later argue that they did not directly cause damage to Allstate or other insurers, thereby insulating themselves from potential criminal or civil liability.

124.    The Defendants' fraudulent scheme was not completed, nor were its full effects realized, until the Defendants received payment, from Allstate, from Allstate claimants or their attorneys.  Allstate issued these payments before it learned about the Defendants' fraudulent scheme. Had Allstate known about the Defendants fraudulent scheme discussed herein, it who have never issued any payments that considered the services purportedly administered at the Defendant businesses.

125.    The Defendants bolstered the appearance of injury to Allstate claimants by routinely prescribing clinically unwarranted (a) courses of physical therapy and chiropractic treatment, (b) pain management consultations and medications, (c) TPI, and (d) EEG and neurophysiological tests, regardless of the Allstate claimants ages', medical needs, injury histories, and comorbidities.

126.    The Defendants fraudulently billed Allstate and Allstate claimants for healthcare services by falsely representing to Allstate that the services were rendered and/or dispensed to the claimants pursuant to Texas law.

127.    The Defendants fraudulently billed Allstate and Allstate claimants for healthcare services when they created and submitted medical bills that were forged, falsified, misrepresented facts, or that were conflicting and deficient.

128.    The Defendants carried out their scheme by unlawfully making self-referrals for healthcare services to Allstate claimants at the Defendant businesses for medically unnecessary services.

129.    The Defendants failed to disclose the connection between and amongst the healthcare practices within the Defendant businesses to Allstate and the Allstate claimants, as required under Federal and Texas State laws.

130.    In reasonable reliance on the Defendants' material representations, Allstate made payments to or for the benefit of the Defendants.

**B.    STRUCTURE OF THE DEFENDANTS' SCHEME TO DEFRAUD**

131.    The scheme described by this Complaint was driven by unauthorized, unnecessary, and fraudulent services in the State of Texas.

132.    The Defendants' conduct constitutes an intentional violation of Texas law regarding qualifications for the administration of services, kickback payments, unlawful medical referrals, and the submitting of false medical documentation.

133.    The primary objective of the Defendants' scheme was to deliver fraudulent and medically unnecessary treatment to patients, not for the benefit of the patients, but rather, to maximize profits to the Defendants at the expense of Allstate.

134.    To achieve their goal, the Defendants colluded to unlawfully operate GHHS, Magbag Wellness, Magbag East, and Brain Diagnostics by billing and submitting false medical

documentation and invoices for healthcare services that were unlawful, unnecessary, overpriced, and/or were not performed as represented.

135.    The false representations regarding the Defendants' services were intentionally placed on records and bills submitted to insurers such as Allstate for the premeditated purpose of obtaining payment in violation of Texas law.

136.    The Defendants perpetrated their scheme by giving the appearance that the businesses were legitimate companies in the business of facilitating and/or providing healthcare.

137.    Unless otherwise pled to the contrary, all documents, notes, reports, health invoices, medical diagnoses, Current Procedural Terminology ("CPT") codes, code tally sheets, referrals, letters and request for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

138.    As set out below, the Defendants unlawfully billed for healthcare services in connection with Allstate claimants.

### C.    UNLAWFUL OWNERSHIP AND CONTROL OF GHHS

139.    GHHS deceptively held itself out as a comprehensive medical facility, purporting to provide physician consultations, diagnostic referrals (such as X-rays and MRIs), prescription management, and injections performed by nurse practitioners under the direction of a medical doctor. However, this representation masked the reality of its operations, lacking legitimate medical oversight and true comprehensive care.

140.    Dr. Magbag is licensed solely as a chiropractor in Texas.

141.    The scope of chiropractic practice in Texas, as defined by Tex. Occ. Code Ann. § 201.002(b)(1)-(2), is limited to evaluating the musculoskeletal system and addressing the subluxation complex.

142.   Dr. Magbag is not a licensed medical doctor in any jurisdiction.

143.   Despite this, he holds ownership and exerts direct control over GHHS, and its providers, whom provided services that fall exclusively within the scope of medicine, including the prescription of medication, and the ordering and oversight of medical tests and procedures.

144.   A true and accurate excerpt from the deposition of Dr. Magbag wherein he admits to exclusively owning GHHS for seven years before enlisting Dr. Alan Tran as a partner is set forth below.

```
16        Q.   Okay.  And you mentioned that Dr. Tran,
17   like -- your name was on the original paperwork, and
18   when did -- but when did Dr. Tran become a co-owner?
19        A.   He became a co-owner in '22, 2022, I believe.
20        Q.   Okay.  So, from 2016 to 2022, you were the
21   sole owner?
22        A.   Yes.
```

145.   This exclusive ownership by a chiropractor of an entity primarily engaged in the practice of medicine directly and fundamentally violates Texas law, including Texas Occupations Code § 155.001, which reserves the practice of medicine for licensed medical professionals.

146.   Dr. Magbag's complete control, unmitigated by any co-owner holding a medical physician license, constitutes the unauthorized practice of medicine and is a direct misrepresentation of GHHS's legal and professional authority, thereby providing a singular mechanism for him to dictate and profit from medical services beyond the scope of his licensure.

147.   It is unlawful for Dr. Magbag, a chiropractor, to dictate, direct, or exert undue influence over the medical treatment decisions and procedures performed by the nurse practitioners working at GHHS in Texas.

148.    Under Texas law, chiropractors operate within a distinct scope of practice that does not include the prescription of medications, performance of medical procedures (such as TPIs), or the overall medical management of a patient's condition in the manner of a nurse practitioner collaborating with a physician. These limitations stand in stark contrast to the broad medical services GHHS purported to provide.

149.    A nurse practitioner, while subject to a scope of treatment and prescriptive authority agreement with a supervising physician, generally exercises his/her own professional judgment in patient evaluation and treatment. Any attempt by a chiropractor to dictate the specific medical interventions, such as TPIs, or to override the clinical judgment of a nurse practitioner constitutes an impermissible intrusion into the nurse practitioner's licensed scope of practice, potentially jeopardizing patient safety and violating the regulations and statutes governing each profession in Texas.

150.    In further support of Allstate's position, Vi Tran recently admitted under oath that Dr. Magbag was the owner of GHHS, and that she deferred her professional judgment to the likes of Dr. Magbag.

151.    A true and accurate excerpt from deposition of Vi Tran is set forth below.

> 11    Q. Okay. And do you report to Dr. Magbag at all?
> 12    A. When it comes to patient care, yes.

152.    The practice of medicine in Texas is strictly regulated under the Texas Occupations Code § 155.001, requiring a license issued by the Texas Medical Board ("TMB"). Furthermore, Section 165.156 of the Medical Practices Act unequivocally prohibits any misrepresentation,

whether through words, marketing, or other means, that falsely suggests a person, partnership, or corporation is licensed to practice medicine.

153.    While Texas law does permit chiropractors and medical doctors to co-own a professional corporation—such as Dr. Alan Tran's purported ownership in GHHS beginning in 2022—this allowance is predicated on a critical and paramount requirement: that each professional's contribution and operational involvement within the business must strictly adhere to the legally defined scope of their respective licenses. This fundamental framework, designed to prevent unlicensed individuals from exercising control over medical practices, was demonstrably circumvented and violated at GHHS.

154.    Dr. Magbag cannot own GHHS because it never actually rendered any chiropractic services.

155.    Had Allstate known that Dr. Magbag, a chiropractor, exclusively owned and controlled GHHS and was dictating the medically unnecessary treatment protocols (discussed in detail below), Allstate would have never issued payment for the fraudulent claims submitted by GHHS.

156.    Allstate relied on the implicit representation that GHHS was operating lawfully under appropriate medical professional ownership and that all billed services were medically necessary and legitimately rendered, representations that were false and misleading due to Dr. Magbag's illicit ownership and control.

157.    Dr. Alan Tran's purported ownership in GHHS, if any, and his role as its Medical Director was solely for the appearance of legal compliance and legitimacy, utterly lacking any real operational control or substantive involvement in the facility's medical practice. This arrangement was a mere façade designed to obfuscate Dr. Magbag's illegal ownership and control.

158.    Indeed, Dr. Magbag and Vi Tran conspired with Dr. Alan Tran, for him to be held out as an "owner" and "Medical Director" of GHHS, in order to give the appearance of the legitimacy of the practices being carried out at GHHS.

159.    In truth, however, Dr. Alan Tran's agreement to be held out as an "owner" and "Medical Director" of GHHS enabled Dr. Magbag, with the assistance of Vi Tran, to run the fraud scheme unfettered, and was in violation of Texas law.

160.    Tex. Occ. Code § 164.052 provides as follows:

> (a)  *A physician or an applicant for a license to practice medicine commits a prohibited practice if that person:*
>
> \* \* \*
>
> *(8) purchases, sells, barters, or uses, or offers to purchase, sell, barter, or use, a medical degree, license, certificate, or diploma, or a transcript of a license, certificate, or diploma in or incident to an application to the board for a license to practice medicine;*
>
> \* \* \*
>
> *(13) impersonates a physician or permits another to use the person's license or certificate to practice medicine in this state;*[and]
>
> \* \* \*
>
> *(17) directly or indirectly aids or abets the practice of medicine by a person, partnership, association, or corporation that is not licensed to practice medicine by the board.*

161.    Dr. Alan Tran did not perform the role of a Medical Director or oversee any services carried out at GHHS.

162.    Despite any purported affiliation, based on Allstate's investigation, Dr. Alan Tran's role at GHHS was a complete sham. He utterly failed to perform the duties of a legitimate Medical

Director, exercising no actual control or oversight of services carried out at GHHS, nor did he supervise the work Vi Tran performed at GHHS or any other nurse practitioners working at the facility.

163.    Instead, Dr. Magbag, a chiropractor, unlawfully usurped the role of Medical Director at GHHS, directly dictating its medical operations despite lacking the requisite medical license. Operating with Vi Tran, Dr. Magbag was present at GHHS almost daily, meticulously executing their pervasive fraud scheme through this unauthorized control.

164.    As discussed in further detail below, this involved unlawfully soliciting patients through personal injury attorneys, then directly supervising and administering extensive medical services without the necessary physician licenses.

165.    Dr. Magbag, with the assistance of Vi Tran, and through GHHS, routinely made improper medical decisions, administered excessive and unnecessary TPIs, prescribed unwarranted medications often sourced from a limited set of two pharmacies, and illicitly self-referred Allstate claimants for additional unnecessary tests and chiropractic therapy.

166.    Dr. Alan Tran did not supervise Vi Tran or any other nurse practitioner working at GHHS.

167.    In light of the extensive fraudulent activities detailed above, and his complete dereliction of duties as a legitimate Medical Director, Dr. Alan Tran knowingly aided and abetted Dr. Magbag and Vi Tran in orchestrating and perpetrating their pervasive fraud scheme at GHHS.

168.    Even assuming, arguendo, that Dr. Alan Tran's purported co-ownership of GHHS was legitimate, Dr. Magbag, as a chiropractor, fundamentally engaged in the unlawful practice of medicine without a license. By exercising pervasive control over GHHS's medical operations, including the oversight of patient treatment, and the performance of medical injections by nurse

practitioners, Dr. Magbag consistently operated and profited from activities far outside the legally defined scope of a licensed chiropractor, regardless of any co-ownership arrangement.

### D.   UNLAWFUL AND UNDISCLOSED REFERRALS

#### 1.   Unlawful Self-Referrals Among the Defendant businesses

169.    Section 105.002 of the Texas Occupations Code concerns unprofessional conduct. It prohibits a healthcare provider, in connection with the providers' professional activities, from knowingly presenting (or causing to be presented) a false or fraudulent claim for the payment of a loss under an insurance policy.  It further prohibits a healthcare provider, in connection with its professional services from knowingly preparing, making, or subscribing to any writing, with the intent to present or use the writing, or allow it to be presented or used, in support of a false or fraudulent claim under an insurance policy. Tex. Occ. Code § 105.002(a)(1)-(2).

170.    The Individual Defendants through the Defendant businesses regularly submitted bills to Allstate seeking payment for treatment and services that were (1) medically unnecessary; (2) unreasonable; and (3) not rendered as represented to patients at issue herein.

171.    As a direct and proximate result of the conduct described herein, the Defendants rendered and/or facilitated the rendering of services, and procedures to patients that were medically unnecessary. These services were not based on legitimate medical need or sound clinical judgment, but were a function of improper and unlawful referrals.

172.    Central to the scheme's fraudulent financial success was Dr. Magbag's direct ownership and pervasive control of the Defendant businesses. This control enabled him to unlawfully dictate and manipulate patient referral patterns throughout his entire network, and subsequently, the treatment provided to those very patients.

173. In the State of Texas, the solicitation and exploitation of motor vehicle accident victims for profit or professional gain is strictly prohibited, as is billing insurers based on factors other than legitimate medical judgment.

174. The Defendants engaged in unnecessary and unlawful self-referrals for chiropractic therapy, diagnostic testing, and medical procedures among the Defendant businesses, all of which are owned by Dr. Magbag.

175. 42 U.S.C. § 1395nn provides that if a physician (or an immediate family member) has a financial relationship (defined as an ownership or investment interest) with a designated health service entity, the physician may not make a referral to that entity or submit a claim for services furnished pursuant to that referral.

176. Texas law similarly prohibits self-referrals. 1 Tex. Admin. Code § 37.1669(12) subjects individuals to administrative actions or sanctions for failing to disclose documentation of financial relationships necessary to establish compliance with the Stark Law (42 U.S.C. § 1395nn and RSA 411.350 - .389), the federal Anti-Kickback Statute, the Affordable Care Act, or other state or federal laws prohibiting self-dealing or self-referral.

177. However, in direct violation of the aforementioned Federal and State laws, the Defendants' fraudulent scheme was fundamentally rooted in self-dealing and deceit.

178. The corporate records of each of the Defendant businesses confirm that Dr. Magbag owned GHHS, Magbag Wellness, Magbag East, and Brain Diagnostics.

179. As part of the fraudulent scheme, Dr. Magbag hired employees, independent contractors, and providers across the Defendant businesses who, at his direction, routinely and unnecessarily cross-referred Allstate claimants to other Defendant businesses.

180.    The employees, independent contractors, and providers were financially incentivized to participate in the self-referral scheme, prioritizing personal gain over the claimants' best interests and legitimate medical necessity.

181.    Under Texas law, it is unlawful for: (1) a person to "solicit[] or receive[], directly or indirectly, overtly or covertly, any remuneration, including any kickback, bribe, or rebate, in cash or in kind for referring an individual to a person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the Medicaid or other HHS program;" (2) "a physician [to] refer[] a Medicaid or other HHS program recipient to an entity with which the physician has a financial relationship for the furnishing of designated health services;" and, (3) a person to "fail[s] to disclose documentation of financial relationships necessary to establish compliance with [state and federal law]." 1 Tex. Admin. Code § 371.1669 (Texas Stark Law).

182.    The Texas Patient Solicitation Act further prohibits payment to any person or entity for referring a patient for healthcare services. 3 Tex. Occ. Code § 102.001.

183.    Specifically, a "payment" under the Texas Patient Solicitation Act means any remuneration, whether it is cash or in kind.

184.    Thus, the scope of prohibited payments under the Texas Patient Solicitation Act is wide and includes veiled value for such exchanges, such as providing office space or "bonuses" or other services to referring providers for less than fair market value.

185.    The cross-referral of Allstate claimants among the Defendant businesses constitutes prohibited self-dealing under Federal and Texas law.

186.    Virtually all medical records submitted by Magbag East and Magbag Wellness to Allstate notate that the Allstate claimant had been referred to Magbag East or Magbag Wellness

for chiropractic services by Vi Tran and other GHHS nurse practitioners, Ronwaldo Chua, Jenien Hampton, Johnny Nguyen, Anh Dinh, and/or Elizabeth Liu.

187.    Although the Brain Diagnostics records submitted to Allstate lacked a specific referring provider, all of these medical records and invoices for EEG and neurophysiological tests performed on Allstate claimants consistently listed "10723 Schroeder Oak Ct, Houston, TX 77070" as the location of the service. This address is identical to the location where claimants received treatment at GHHS and Magbag Wellness.

188.    Moreover, Brain Diagnostics often performed EEG and neurophysiological testing on Allstate claimants the same day as their visit to GHHS.

189.    Thus, the overlapping dates and location of the services of Allstate claimants at GHHS and Brain Diagnostics, as well as Dr. Magbag's ownership of both enterprises, makes it irrefutably evident that GHHS' providers had unlawfully referred Allstate claimants to Brain Diagnostics for the EEG and neurophysiological testing.

190.    Based on Allstate's investigation, Defendant businesses set aside monies to pay kickbacks and "bonuses" to medical providers and others who referred patients to them.

191.    Vi Tran admitted under oath that she would receive bonuses from GHHS based on the number of patients she saw.

192.    A true and accurate excerpt from her deposition is set out below.

> 25    Q.  Okay.  And do you -- in addition to your flat
>
> Page 17
>
> 1    rate, are you paid any kind of performance bonus for
> 2    your services?
> 3        A.  Yes.
> 4        Q.  Okay.  And how is that bonus determined?
> 5        A.  How many patients I see, responsibilities that
> 6    I take on out of being a medical provider.

193.    To later hide this fact, during a subsequent deposition, Vi Tran falsely denied and concealed her receipt of bonuses from GHHS, directly contradicting her prior admission.

194.    A true and accurate excerpt of Vi Tran's blatantly contradictory testimony in a separate case is provided below.

> 13    Q.  Okay.  Do you receive any kind of bonus or
> 14    incentivized pay for performing a certain number of
> 15    injections in a given period of time?
> 16        A.  No, sir.  I do not.
> 17    Q.  Okay.  Are you paid any, you know, bonus or
> 18    other incentivized type of payment for the number of
> 19    patients you see in a given period of time?
> 20        A.  No, I do not.

195.    The Defendants failed to disclose to Allstate claimants and Allstate that GHHS was issuing payments to providers under their control in exchange for referring them to the other Defendant businesses.

196.    The Defendants also failed to disclose to Allstate claimants or Allstate that the Defendant businesses to whom they were being referred were all owned by the same individual, Dr. Magbag, prejudicing both Allstate claimants and Allstate.

197.    By deliberately concealing these financial interests and connections, the Defendants stripped Allstate claimants of their fundamental right to make informed healthcare decisions, preventing them from choosing alternative providers and effectively shopping for more cost-effective care.

198.    Had Allstate been privy to the Defendants' unlawful quid-pro-quo referral scheme, it never would have authorized any payments. The Defendants' deceptive practices directly induced these payments, constituting outright fraud.

### 2.    Unlawful and Undisclosed Referrals by GHHS to Pharmacies

199.    The Defendants maintained unlawful referral arrangements with pharmacies, which targeted victims involved in motor vehicle accidents in Texas.

200.    As part of the scheme, and at the direction of Dr. Magbag, GHHS providers, including Vi Tran, routinely prescribed unnecessary medication to Allstate claimants during initial and subsequent visits, regardless of the individual patient needs, including Lidocaine 5% ointment and Flexeril.

201.    Lidocaine 5% ointment is a topical analgesic, which is used for temporary relief.  It is not a first-line treatment for musculoskeletal pain; rather, it is indicated for temporary pain relief for minor burns, skin abrasions, and insect bites.

202.    Indeed, the product labeling for Lidocaine 5% ointment confirms that the drug is not effective when applied on intact skin, because Lidocaine 5% ointment is incapable of sufficiently penetrating intact skin.

203.    The Allstate claimants that were prescribed Lidocaine 5% ointment did not have any documented minor skin conditions or true neuropathic pain warranting Lidocaine 5% ointment.

204. The Lidocaine ointment prescribed was ineffective and unnecessary because the drug is not proven to be safe or effective for treating deep joint pain in areas such as the shoulders or back.

205. Despite the widespread availability of Lidocaine 4% patches and creams over-the-counter for as little as $25.00 per 15-patch package (e.g., Salonpas), Family Pharmacy, Inc. ("Family Pharmacy") and Sterling Pharmacy, LLC ("Sterling Pharmacy") on information and belief, systematically exploited Allstate claimants by routinely billing hundreds of dollars for these same unnecessary prescriptions.

206. Based on the evidence obtained during Allstate's investigation, GHHS profited from its nurse practitioners writing unnecessary prescriptions for medications at the direction of Dr. Magbag, because it received kickbacks, in cash or in kind, from the participating pharmacies, including Family Pharmacy and Sterling Pharmacy. The referrals to these participating pharmacies were shockingly pervasive, so much so that these entities alone were responsible for a staggering 76% of all prescription medications ordered by GHHS nurse practitioners.

207. Family Pharmacy, through its operator Kevin Michael Gray ("Gray"), has a confirmed history of engaging in criminal kickback schemes directly relevant to the illicit referral practices alleged herein. On December 1, 2016, Gray was sentenced in federal court to 28 months in prison for bribery and tax violations in connection with a health care fraud scheme. Gray admitted to a scheme spanning over two years, ending in January 2014, in which they paid over $813,560.87 in illegal kickbacks to a chiropractor. These kickbacks were specifically for patient referrals of federally-insured employees requiring prescription services, thereby defrauding the U.S. Department of Labor's health care benefit programs. Beyond the prison term, Gray was ordered to pay $245,692.00 in restitution to the IRS, a $100,000.00 fine, $6,500.00 in court costs,

and was held jointly and severally liable for the $813,560.87 restitution to the U.S. Department of Labor. This federal conviction corroborates Family Pharmacy's direct involvement in widespread, unlawful patient referral and kickback arrangements designed for fraudulent financial gain.

208.    To ensure Allstate claimants were directed towards the participating pharmacies, Dr. Magbag routinely directed GHHS providers to use pre-printed prescription forms provided to GHHS by Family Pharmacy and Sterling Pharmacy.

209.    The pervasive nature of the unlawful referral arrangements among the Defendants, and the aforementioned pharmacies was conclusively substantiated by the design of the pre-printed prescription forms.

210.    The presence of GHHS providers' names on pre-printed prescription forms from these pharmacies corroborates the unlawful referral arrangements, through which Allstate claimants were routinely and unnecessarily funneled.

211.    A true and accurate representative sample of a pre-printed prescription form from Sterling Pharmacy, which includes the letterhead of Defendant Vi Tran (a GHHS provider) is depicted below:

**Vi Chau Tran, FNP-C**
**Greater Houston Healthcare Solutions**
10723 Schroeder Oak Ct
Houston, Texas 77070
Phone: 713-240-1626        Fax:  281-612-1903
DEA:                    NPI:1861873655

Name: P██████ A████████              Date: 12-22-2020
Address: ████████████                DOB: ██████
City: Houston           State: TX  Zip Code: ████████
Drug Allergy: ████████               Sex: Male or Female
Phone: ████████████  Emergency Contact Phone: ████████
[] Label in Vietnamese        [] Label in Spanish
[] Label in Chinese

Law Firm Name: ___ McCarthys ___  Date of Injury: 12/14/20
Phone: ___ 713-306 8504 ___ Fax: ___              #20:

[] Deliver/SHIP to patient home.   [] Deliver/SHIP to clinic address: 2700 Westridge Dr
                                                              Houston TX 77054
[] Mobic (Meloxicam) 7.5mg #___ Sig: 1tpobid;    [] Meloxicam 15mg #___ Sig: 1tpoqd.
[] Motrin (Ibuprofen) 400mg or 600mg or 800mg # 30 Sig:1tpobidprnpain
[] Naprosyn (Naproxen) 500mg #___ Sig:1tpoq12hprn-Take with foods.

[] Nexium (Esomeprazole) 20mg ___ Sig: 1cpobid to prevent stomach ulcers while taking NSAID.
[] Pepcid (Famotidine) 20mg ___ Sig: 1tpotid to prevent stomach ulcers while taking NSAID.

[] Flexeril (Cyclobenzaprine) 5mg or 10mg # 30 Sig:1tpobidprnspasm
[] Robaxin (Methocarbamol) 500mg or 750mg #___ Sig:1tpobidprnspasm
[] Lioresal (Baclofen) 10 or 20mg #___ Sig: 1tpotid-qidprnspasm.
[] Zanaflex (Tizanidine) 2mg or 4mg #___ Sig: 1tpotidprnspasm.

[] Fioricet #___ Sig: 1tpoq6hprn headache.
[] Neurontin (Gabapentin) 100mg or 300mg #___ Sig: 1cappoqhs for nerve pain.

[] Medrol Dose Pak #1 sig: Follow directions on package as directed-take with food.
[] Lidocaine 5% Ointment #1 Tube/Jar      Sig: Apply topically to AAA TID prn.
[] Tylenol #3: ___ Sig: 1tq4-6hprnpain;
[] Tylenol #4: ___Sig: 1tpoq4-6hprnpain.
[] Ultram 50mg#___Sig: 1tpobidprnpain;
[] Walker #1              Use as directed;
[] Back Brace #1          Use as directed;
[] Neck Cervical Collar Brace #1      Use as directed
[] Knee Brace Adjustable #1           Use as directed
[] Right / Left Wrist Brace #1        Use as directed

Provider's Signature: ___

**STERLING PHARMACY & MEDICAL SUPPLIES**
6609 W Sam Houston Pkwy S, Ste 98B Houston, Texas 77072
Telephone: 713-995-8885 eFax:1-888-512-6266

212.    A true and accurate representative sample of a pre-printed prescription form from Family Pharmacy, Inc., which includes the name of Ronwaldo Chua (a GHHS provider) is depicted below:

213.    The presence of pre-printed prescription forms specific to these pharmacies, already in GHHS providers' possession, unequivocally demonstrates a pre-existing system to funnel patients into a prohibited referral scheme.

214.    By failing to disclose their unlawful quid-pro-quo referral scheme with pharmacies to Allstate claimants and Allstate, the Defendants directly violated Federal and Texas state law.

215.    The covert nature of this quid pro quo referral scheme not only stripped Allstate claimants of their fundamental right to make informed decisions about their own healthcare, but also effectively coerced them into patronizing specific pharmacies, thereby denying them the crucial opportunity to compare costs and choose more affordable alternatives.

216.    Had Allstate known that the Defendants were unlawfully engaged in a quid-pro-quo referral agreement and receiving kickbacks for writing prescriptions, it would not have paid the claims, either directly or as part of bodily injury case settlements. These payments were directly induced by fraud.

### 3.    Unlawful and Undisclosed Referrals to Harmon Therapeutic

217.    The Defendants maintained an unlawful referral arrangements with Harmon Therapeutic Counseling, LPC ("Harmon Therapudic"), which targeted victims involved in motor vehicle accidents in Texas.

218.    As part of the scheme, and at the direction of Dr. Magbag, GHHS providers, including Vi Tran, routinely prescribed psychological evaluations to Allstate claimants during initial and subsequent visits, regardless of the individual patient needs under the guise that the Allstate claimant was suffering from anxiety post-accident.

219.    Based on the evidence obtained during Allstate's investigation, Dr. Magbag and his sister, Christina Harmon ("Harmon") profited from GHHS nurse practitioners writing unnecessary prescriptions for psychological consultations that were rendered telephonically from the offices of either Magbag Wellness, Magbag Chiropractic, or GHHS on the same day as the prescription for a psychological consultation was ordered.

220.    On information and belief, neither Dr. Magbag, Harmon, nor their employees informed the patients about the familial relationship between Dr. Magbag and Christina Harmon. This undisclosed financial tie and conflict of interest deprived patients of their ability to make an informed choice. By concealing the profit motive and the familial link, the patients were allegedly prevented from:

- Selecting their own providers based on independent research.

- Price shopping or seeking a second, unbiased opinion.

221.    The failure to inform patients that a recommendation for services is driven by an underlying financial relationship between the referring party and the service provider is improper, as it violates the principle of informed consent and the patient's right to an unbiased referral.

E.    BILLING FOR SERVICES THAT WERE NOT MEDICALLY NECESSARY

222.    The Defendants' unlawful and self-serving referral schemes were not merely a mechanism for patient acquisition; rather, it directly facilitated and incentivized the provision of medically unnecessary and improper treatment to Allstate claimants.

223.    To maximize their financial gain, the Defendants adhered to a predetermined protocol of medically unnecessary, indiscriminate, and fraudulent treatment and testing, that lacked individualized treatment goals.

224.    This protocol was specifically engineered by Dr. Magbag to unlawfully generate repeated and excessive treatment for patients across his network of owned or controlled businesses—the Defendant businesses.

225.    Under Texas law, health care professionals are expressly mandated by Section 101.203 of the Texas Occupations Code to comply with the prohibitions outlined in Section 311.0025 of the Health & Safety Code. Tex. Occ. Code § 101.203 (West 2012).

226.    Specifically, Section 311.0025(a) of the Texas Health and Safety Code unequivocally prohibits the following:

> *A hospital, treatment facility, mental health facility, or health care professional may not submit to a patient or a third party payor a bill for a treatment that the hospital, facility, or professional knows was not provided or knows was improper, unreasonable, or medically or clinically unnecessary.*

227.    In flagrant violation of these clear statutory mandates, the Defendants knowingly submitted charges for medical treatment that was improper, unreasonable, and medically unnecessary.

228.    The treatments purportedly administered by providers at the Defendant businesses were applied uniformly and indiscriminately, entirely disregarding patients' presenting complaints, documented progress, age, specific diagnoses, or severity of condition.

229.    This predetermined and indiscriminate treatment protocol directly violated accepted standards of care within the medical community.

230.    The American Medical Association, establishing a widely recognized benchmark for appropriate medical practice, defines "medical necessity" as:

> Healthcare services or products that a prudent physician would provide to a patient for the purpose of preventing, diagnosing or treating an illness, injury, disease, or symptoms in a manner that is (a) in accordance, with generally accepted standards of medical practice; (b) clinically appropriate in terms of type, frequency, extent, site, and duration; and (c) not primarily for the economic benefit of the health plans and purchasers or for the convenience of the patient, treating physician, or other health care provider.[3]

231.    Further evidencing their fraudulent practices, the Defendants' patient records are cursory, incomplete, and conflicting. These deficient records lack any meaningful assessment of patient response to chiropractic treatment or injections, and show no alteration of treatment following interventions or diagnostic testing, demonstrating a complete disregard for individualized patient care.

232.    In sum, the totality of purported care provided across GHHS, Magbag Wellness, Magbag East, and Brain Diagnostics was medically unnecessary, unsubstantiated, and excessive.

---

[3] Institute of Medicine, Committee on Defining and Revising an Essential Health Benefits Package for Qualified Health Plans (2011).

233.    If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary, and therefore, non-compensable.

234.    Allstate is not required to pay the Defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid as a result of the Defendant's fraud.

235.    The full extent of the Defendants' misrepresentations regarding the (lack of) lawfulness and necessity of the treatment they billed was not known to Allstate until it undertook the full investigation that culminated in the filing of this action.

236.    The Defendants' overarching fraudulent predetermined protocol permeated every aspect of their operation. The following sections will meticulously detail how each of the Defendant businesses —GHHS, Magbag Wellness, Magbag East, and Brain Diagnostics— systematically implemented this scheme through the provision of specific, fraudulent, and medically unnecessary treatments that exemplify their pervasive disregard for legitimate patient care.

### 1.    <u>Unnecessary and Unlawful Modalities</u>

237.    Under Dr. Magbag's direction, chiropractors affiliated with Magbag Wellness and Magbag East employed standardized chiropractic therapy treatment plans, disregarding individual patient needs.

238.    Allstate claimants were routinely subjected to an excessive and medically unjustifiable number of therapy sessions, frequently ranging from 13 to 20 visits, often without documented serious symptoms or objective findings necessitating such intensive and prolonged treatment.

239.     This pattern of excessive treatment directly resulted in grossly inflated invoices, with charges typically ranging between $4,000.00 to $7,000.00 generated per Allstate claimant, far exceeding reasonable and medically necessary costs.

240.     The initial care provided by chiropractors at Magbag Wellness and Magbag East allowed them to fabricate a false foundation for the delivery of prolonged and unnecessary services. In fact, Allstate claimants were routinely instructed by chiropractors at Magbag Wellness and Magbag East to commence therapy on the same day as their initial examination to quickly generate bills.

241.     The therapy treatment protocol generated a steady stream of revenue because Allstate claimants were given the same treatment plans, which called for numerous office visits per week over months.

242.     The prescription of therapy also helped propel the scheme because the excessive treatment protocol created a false impression of the patients' actual injuries.

243.     The initial assessment reports generated by chiropractors at Magbag Wellness and Magbag East, and subsequently submitted to Allstate, exhibit a striking and highly improbable similarity across virtually all patients. These assessments consistently culminated in recommendations for a nearly identical plan of care for each individual, and stood in stark contrast to the typical course of treatment for similar conditions, which usually involves once-weekly therapy for approximately six weeks.

244.     The chiropractors at Magbag Wellness and Magbag East relied on template forms when documenting treatment, which further underscored the lack of individualized attention patients received.

245.    At the express direction and behest of Dr. Magbag, chiropractors and other employees at Magbag Wellness and Magbag East (including Vi Tran) systematically utilized standardized, templated treatment notes and bills. These standardized documents were uniformly applied to Allstate claimants across the board, irrespective of individual patient needs or clinical presentation, thus indicating a pattern of predetermined treatment and billing rather than individualized medical assessment and care.

246.    The predetermined treatment plans recommended consistently lacked quantifiable treatment goals and failed to include objective measurements of functional loss. Furthermore, the records frequently omitted any reported limitations in Allstate claimants' daily activities, despite the provision of ongoing care. The patient records routinely failed to objectively demonstrate any continuing need for the extensive and prolonged treatment provided.

247.    Regardless of the lack of documented need, Allstate claimants' treatment was routinely and unjustifiably extended well beyond any reasonable point of therapeutic benefit. Examination findings, where they existed, did not provide objective evidence of ongoing functional loss or a reasonable chiropractic probability that continued care would result in further functional improvement.

248.    On subsequent visits, the "Objective," "Assessment," and "Plan" sections of the provider's templated forms were consistently left blank. This systematic omission demonstrates that the claimant's subjective complaints, evolving diagnosis, and ongoing treatment plan were not, in fact, assessed during each visit to determine progress, functional improvement, or the reasonable expectation of benefit from continued care.

249.    Therapy continued far beyond any point of functional improvement or reduced medication, consistently constituting non-medically necessary maintenance care after the patient had plateaued.

250.    The medical bills submitted were not adequately supported by corresponding documentation in the patient records. Specifically, despite the involvement of multiple providers within the clinic, daily records frequently lacked sufficient documentation, including legible signatures or initials, to identify the specific provider purportedly supervising or rendering the reported treatment. This deficiency makes it impossible to ascertain who provided which service, or if the services were provided as billed.

251.    By way of example, in the case of claimant S.M. (claim no. 0723185294), chiropractors at Magbag Wellness and Magbag East, under Dr. Magbag's direct supervision and direction, fraudulently prescribed and billed for care that was both prolonged and excessive. Despite minimal objective findings from the initial examination and a glaring absence of documented functional improvement in subsequent records, S.M.'s treatment extended far beyond any reasonable or medically necessary initial trial period.

252.    Allstate claimant, S.M., received extended care despite no objective evidence in his records demonstrating a positive response to initial treatment, ongoing functional loss warranting continued intervention, or a reduction in the need for medications or other skilled interventions. This prolonged treatment regimen included the in-office application of heat and ice packs, billed under CPT Code 97010. While heat and ice are commonly recommended as self-care treatments to foster patient independence and improve outcomes, the records submitted by Magbag Wellness and Magbag East failed to document any medical necessity for the professional administration or oversight of this service. Absent such justification, the continued and extended provision of care,

including the in-office application of heat and ice packs, constituted medically unnecessary services.

253.    Magbag Wellness and Magbag East routinely and improperly billed for medically unnecessary heat and ice pack applications (CPT Code 97010) across numerous Allstate claimants. This systematic billing practice served to improperly inflate the total charges submitted to Allstate and its claimants, rather than providing medically necessary therapeutic care.

254.    None of the billing for heat and ice pack application (CPT Code 97010) was necessary, including all of those identified in Exhibit 1. All of these fraudulent bills traveled through the U.S. Mail. Allstate relied on these bills when making payments.

255.    Allstate claimant, S.M., was also purportedly treated with ultrasound therapy, billed under CPT Code 97035. This is a time-based service requiring specific documentation of direct, one-on-one, constant attendance by a qualified healthcare professional for at least 15 minutes per billed unit. The records submitted by Magbag Wellness and Magbag East for S.M.'s treatment with ultrasound therapy demonstrate a systemic failure to meet these documentation requirements, rendering the services medically unnecessary and improperly billed.

256.    Specifically, the records submitted by Magbag Wellness and Magbag East lack any indication of the specific settings used for the ultrasound device (e.g., intensity, frequency, duty cycle).   The records fail to identify the precise body part that was treated with ultrasound. There is no documentation of the claimant's response to the therapy, including any reported changes in symptoms or functional status.

257.    The use of pre-templated forms, often indicated by merely circling a number of units or using a multiplier, lacks encounter-specific information and is wholly insufficient to support the medical necessity or proper rendering of the service.

258.    Crucially, the records do not adequately identify who rendered the specific ultrasound service, thereby failing to substantiate that the service was administered by a qualified healthcare professional as mandated by the American Medical Association (AMA) guidelines for CPT Code 97035.

259.    Magbag Wellness and Magbag East routinely and systematically billed Allstate for ultrasound therapy (CPT Code 97035) administered to numerous Allstate claimants, despite the services being medically unnecessary, not being performed in accordance with billing requirements, and/or lacking the required documentation.

260.    None of the billing for ultrasound therapy (CPT Code 97035) was necessary, including all those identified in Exhibit 2. All of these fraudulent bills traveled through the U.S. Mail. Allstate relied on these bills when making payments.

261.    Allstate claimant, S.M., was also purportedly treated with massage therapy, billed under CPT Code 97124. Medically necessary massage would include specific clinical findings with measurable goals and documentation of the claimant's response to the treatment session. It would also indicate the technique used and would not bill mechanical devices or machines as massage. This is a time- based service requiring 15 minutes per unit billed and there was insufficient documentation that the claimant received the minimum treatment time to bill for this service.

262.    Again, the records do not adequately identify who rendered the specific massage therapy. In fact, there was no indication that the claimant received the required direct 1:1 service by a skilled professional. Therefore, massage therapy cannot be supported as medically necessary.

263.    Magbag Wellness and Magbag East routinely and systematically billed Allstate for massage therapy (CPT Code 97124) administered to numerous Allstate claimants, despite the

services being medically unnecessary, not being performed in accordance with billing requirements, and/or lacking the required documentation.

264.    None of the billing for ultrasound therapy (CPT Code 97124) was necessary, including all those identified in Exhibit 3. All of these fraudulent bills traveled through the U.S. Mail. Allstate relied on these bills when making payments.

265.    Allstate claimant, S.M., also received charges for therapeutic exercise, billed under CPT Code 97110. Medically necessary therapeutic exercise requires the documentation of specific functional deficits identified during examination that necessitate skilled intervention for their resolution. Furthermore, as a time-based service, accurate and detailed time documentation is mandatory to support the number of units billed for each visit.

266.    The records submitted by Magbag Wellness and Magbag East for S.M.'s treatment with therapeutic exercise failed to meet these essential documentation requirements, rendering the services medically unnecessary and improperly billed.

267.    Specifically, the records do not adequately support the need for ongoing medical oversight of the therapeutic exercise. For instance, the necessary time documentation to support the units billed was not met for each visit. There is no clear indication of progression or improved functional capacity of objective limitations that would justify the ongoing medical need for skilled intervention.

268.    The therapeutic exercise treatment continued despite a lack of documented evidence of S.M. responding to the initial treatment or demonstrating objective ongoing functional loss that would benefit from continued skilled care.

269.     These deficiencies, as highlighted by accepted industry standards demonstrate that the therapeutic exercise services provided to S.M. were not medically necessary and were improperly billed.

270.     Magbag Wellness and Magbag East routinely and systematically billed Allstate for therapeutic exercise (CPT Code 97110) administered to numerous Allstate claimants, despite the services being medically unnecessary, not performed in accordance with billing requirements and/or lacking the required documentation.

271.     None of the bills for therapeutic exercises (CPT Code 97110) were necessary, including all those identified in Exhibit 4. All of these fraudulent bills traveled through the U.S. Mail. Allstate relied on these bills when making payments.

272.     Allstate claimant, S.M., was charged for self-care management training, billed under CPT Code 97535. This service is a time-based code requiring documentation of direct, one-on-one provider contact for each 15-minute unit billed.

273.     The medical records submitted for S.M. do not support the medical necessity or the actual provision of this service. Specifically, there is no documentation of clear functional deficits or an inability for S.M. to perform specific activities of daily living that would necessitate self-care management training.

274.     The corresponding records lack any specific documentation detailing what training was purportedly provided to address these purported limitations.

275.     Given the AMA requirements for billing under CPT Code 97535, the absence of documented functional deficits and specific training details renders this service medically unnecessary and unlawfully billed.

276.    Magbag Wellness and Magbag East routinely and systematically billed Allstate for self-care management training (CPT Code 97535) administered to numerous Allstate claimants. This systematic billing occurred despite these services being medically unnecessary, not being performed in accordance with billing requirements, and/or lacking the required documentation.

277.    None of the bills for self-care management training (CPT Code 97535) were necessary, including all those identified in Exhibit 5. All of these fraudulent bills traveled through the U.S. Mail. Allstate relied on these bills when making payments.

278.    Allstate claimant S.M. also received charges for a "treatment summary" billed under CPT Code 99080, which is specifically designated for billing third-parties who have expressly commissioned a medical provider to furnish a narrative summary of clinical records. The charge for this service to S.M. was not medically necessary and was improperly submitted, as it does not represent a direct healthcare service provided to the claimant. Moreover, this service is not appropriately reported as a separate and distinct clinical service because medical documentation is an inherent part of any clinical encounter and should not be billed independently.

279.    The systematic billing for "treatment summary" reports (CPT Code 99080), as exemplified by the charge to S.M., constitutes manifest fraud. Magbag East and Magbag Wellness systematically billed each Allstate claimant $200.00 for the above mentioned "summary report" of their treatment. This charge is particularly unreasonable, because the summary reports were neither required nor requested by the Allstate claimants or Allstate.

280.    This billing practice is undertaken for the purpose of improperly inflating costs associated with claimants' files and is designed to allow claimants' attorneys to utilize these reports in lieu of retaining independent medical experts.

281.    None of the bills for treatment summary reports (CPT Code 99080) were necessary, including all those identified in Exhibit 6. All of these fraudulent bills traveled through the U.S. Mail. Allstate relied on these bills when making payments.

282.    In his deposition, Dr. Magbag admitted that the summary reports were generated for personal injury attorneys.

283.    A true and accurate excerpt of the January 24, 2025 deposition by Dr. Magbag is depicted below:

```
13        Q.  Okay.  Is this the -- like, this -- the format
14   of this patient treatment summary, is it the -- just a
15   standard format that you -- that your office uses for
16   all of their patients?
17        A.  Yes.
18        Q.  Okay.  And is this something that Magbag
19   Wellness and Rehab charges patients for?
20        A.  I'm not sure if there's a -- I'm not sure if
21   we did or not.  I'd have to --
22        Q.  Okay.
23        A.  -- look at the bill.
24        Q.  And is this -- I guess, who is this patient
25   treatment summary intended to be for?  Like, is it for
```

                    *        *        *

```
1    the patient, their attorney, the jury?  How does that
2    work?
3        A.  It's for the attorney.
```

284.    Dr. Magbag's own admission regarding the "treatment summary" reports (CPT Code 99080) and the systematic use of standardized notes and bills, reveal a sophisticated and

collusive strategy between personal injury attorneys and Dr. Magbag, Magbag Wellness, and Magbag East.

285.    The overarching theme and purpose of this scheme was not to provide medically necessary care or address genuine patient injuries, but rather to generate inflated bills and reports, and create spurious documentation solely for the purpose of maximizing damages in litigation against Allstate.

286.    Specifically, Dr. Magbag's admission that summary reports were intended for use in litigation, not for genuine medical purposes or as a requirement of any medical board, directly exposes the fraudulent intent behind billing for these services. These reports, and by extension the "treatment" they purport to summarize, were expressly created to serve the attorneys' and litigation efforts against Allstate, effectively substituting for independent expert opinions and thereby unconscionably inflating costs.

287.    This pattern of inappropriate direction by attorneys in the healthcare management of Allstate claimants, coupled with the systematic generation of bills and documentation that do not reflect genuine medical necessity, demonstrates a concerted effort to defraud Allstate by presenting a facade of legitimate medical treatment where, in reality, services and records were primarily driven by the pursuit of inflated damages in litigation.

## 2.    Unnecessary and Unlawful Trigger Point Injections

288.    TPIs constituted the primary service administered to Allstate claimants at GHHS, forming a central component of its predetermined treatment protocol. This pervasive use of TPIs was directly linked to profit generation through frequent administration, rather than individualized patient need.

289.    Under the direct supervision and direction of Dr. Magbag (a chiropractor), nurse practitioners, including Vi Tran, through GHHS, routinely administered TPIs to Allstate claimants very early in their treatment course, long before allowing conservative measures like chiropractic or physical therapy to take effect, or even prescribing home care or allowing for passage of time for natural improvement. Pain following trauma can often effectively improve with such conservative measures, rendering the early and routine administration of TPIs medically unnecessary.

290.    In a clear departure from accepted medical standards, nurse practitioners at GHHS, including Vi Tran, acting under Dr. Magbag's direction, routinely referred patients to Magbag Wellness or Magbag East for chiropractic therapy services, and then administered TPIs on the very same day.

291.    This practice was clearly designed not for genuine patient benefit, but to enable simultaneous and inflated billing for both the Magbag chiropractic clinics and GHHS for every Allstate claimant who presented, irrespective of medical necessity, or whether Dr. Magbag was licensed to prescribe the services. This simultaneous billing scheme facilitated a predatory revenue generation model that prioritized financial gain over patient care.

292.    By way of example, Allstate claimant, F.M. (claim no. 0720840123), was involved in a motor vehicle collision on July 10, 2023. Following the collision, Emergency Medical Services ("EMS") responded to the scene and transported F.M. to HCA Houston West emergency department. During her visit, she reportedly complained of back pain. X-rays of her lumbar and thoracic spine were performed, and the impression indicated no acute fracture or malalignment of the lumbar and thoracic spine.

51

293.    According to the emergency department records, it is alleged that findings of the musculoskeletal examination included normal back curvature, normal appearance of the cervical, upper trapezius/thoracic, right shoulder/arm, and lumbar areas, a positive Straight Leg Raise ("SLR") on the right, tenderness with palpation, limited range of motion in areas of tenderness, and no deformities.

294.    Pursuant to the predetermined protocol, Vi Tran prescribed F.M. ibuprofen, cyclobenzaprine, and topical 5% lidocaine. That same day, TPIs were purportedly performed by Vi Tran in F.M.'s bilateral cervical and lumbar paraspinal muscles, prior to allowing conservative measures with chiropractic therapy to take effect, and unlawful and improper BrainScope testing was conducted at Brain Diagnostics – all at the same address.

295.    The injections administered to F.M. on July 13, 2023 were medically unnecessary and premature, and were performed at the behest of Dr. Magbag, prior to allowing conservative measures with chiropractic therapy to take effect. In numerous instances, pain following trauma will significantly improve with conservative measures, such as chiropractic or physical therapy, making invasive TPIs unnecessary.

296.    The Defendants' protocol ensured that almost all Allstate claimants consulting with GHHS' providers received TPIs, despite a lack of specific clinical indication.

297.    Subsequent TPIs administered to F.M. on July 27, 2023, and October 6, 2023, were likewise medically unnecessary. Critically, the medical records from these encounters inexplicably fail to document F.M.'s response to the initial set of injections. Despite these repeated procedures, F.M. continued to report persistent cervical and lumbar pain at these follow-up visits, clearly indicating a lack of benefit from both the initial and all subsequent injections. As the initial treatment provided no relief, there was simply no logical or medical basis to expect a different

outcome from repetitive, closely spaced injections. This aggressive approach—three sets of injections in such a short timeframe—is highly unusual and lacks any credible medical evidence to support its efficacy.

298.    The aforementioned predetermined treatment protocol consistently followed by GHHS and its providers was explicitly designed to maximize the Defendants' profits, rather than to provide medically necessary care tailored to the individual needs of Allstate claimants.

299.    In furtherance of this scheme, GHHS routinely billed Allstate $6,000.00 for each TPI purportedly administered to Allstate claimants, further demonstrating the profit-driven nature of these medically unnecessary services, which require no anesthesia and take less than five minutes to administer.

300.    The existence of a predetermined treatment protocol is further evidenced by the pre-printed treatment form utilized by GHHS, which essentially listed only two services: consultations and the administration of TPIs.

301.    A true and accurate depiction of the GHHS protocol is provided below:

GREATER
**HOUSTON HEALTHCARE**
SOLUTIONS

TEL: (713)240-1626 FAX: (281)612-1903 EMAIL: GREATERHOUSTONHEALTHCARE@GMAIL.COM

Patient Name: ▮▮▮▮▮▮▮                    Date: 10/1/2021

Diagnosis:

| | | | | |
|---|---|---|---|---|
| 1) | ms4.2 | 2) | ms4.6 | |
| 3) | ms4.5 | 4) | ms RS1 | |
| 5) | g47.9 | 6) | ms5.S5 (R) | |

| Code | Description |
|---|---|
| 99203 | **Office or other outpatient visit** for the evaluation and management of a **new** patient, which requires these 3 key components:<br>A detailed history;<br>A detailed examination;<br>Medical decision making of low complexity. |
| 99204 | **Office or other outpatient visit** for the evaluation and management of a **new** patient, which requires these 3 key components:<br>A comprehensive history;<br>A comprehensive examination;<br>Medical decision making of moderate complexity. |
| 99212 | **Office or other outpatient visit** for the evaluation and management of an **established** patient, which requires at least 2 of these 3 key components:<br>A problem focused history;<br>A problem focused examination;<br>Straightforward medical decision making. |
| 99213 | **Office or other outpatient visit** for the evaluation and management of an established patient, which requires at least 2 of these 3 key components:<br>An expanded problem focused history;<br>An expanded problem focused examination;<br>Medical decision making of low complexity. |
| 20552 | Injection(s); single or multiple trigger point(s), 1 or 2 muscle(s) |
| 20553 | Injection(s); single or multiple trigger point(s), 3 or more muscle(s) |

DocuSigned by:

Patient Signature                                    10/1/2021
                                                    Date

302.    The above form demonstrates the intention of the GHHS to provide TPIs to all of its patients, including Allstate claimants, unless a patient explicitly refused to comply with the standard protocol.

303.    GHHS routinely and systematically billed Allstate for TPI (under CPT Code 20552 or 20553) administered to numerous Allstate claimants, despite the services being medically

unnecessary, not performed in accordance with billing requirements, and/or lacking the required documentation.

304.    None of the bills for TPIs (CPT Codes 20552 and 20553) were necessary, including all those identified in Exhibit 7. All of these fraudulent bills traveled through the U.S. Mail. Allstate relied on these bills when making payments.

### 3.    Unnecessary EEG and Neurophysiological Testing

305.    Allstate claimants presenting at GHHS were unlawfully and routinely referred to Brain Diagnostics, a company wholly owned by Dr. Magbag. These referrals were orchestrated by GHHS providers operating under Dr. Magbag's direct control (including Vi Tran), ensuring claimants were subjected to unnecessary EEG and neurophysiological testing by way of the BrainScope One device ("BrainScope"). The fact that these tests were conducted at the same physical location as GHHS further underscores the improper financial arrangement and demonstrates a complete lack of an arms-length referral process for medically justified services.

#### a.    *BrainScope Studies Were Medically Unnecessary*

306.    The BrainScope is marketed as a handheld, non-invasive tool intended to aid in the objective assessment of mild traumatic brain injury ("mTBI"), or concussion, at the point of care. It purports to analyze brain EEG and neurocognitive function to provide a "Concussion Index," ostensibly assisting clinicians in determining the likelihood of structural brain injury and evaluating neurocognitive impairment.

307.    Furthermore, the American Clinical Neurophysiology Society has concluded that current evidence does not support the use of EEG for diagnosing concussions, either acutely or at a later stage.

308.    Brain Diagnostics, however, routinely subjected Allstate claimants to BrainScope testing even when they lacked the requisite symptoms, were outside the FDA-cleared age range, or exceeded the approved timeframe since symptom onset, rendering the testing medically unwarranted, without efficacy, and worthless.

309.    The BrainScope tests administered to Allstate claimants consistently yielded the same useless and inconclusive result: "Unable to rule out likelihood of structural brain injury visible on head CT." This boilerplate finding provided no actionable diagnostic information and served only to justify further billing.

310.    As demonstrated by the case of Allstate claimant, C.Y. (claim no. 0727651259), the administration of BrainScope services by Dr. Magbag and Brain Diagnostics routinely disregarded the device's own established FDA-cleared parameters and true clinical utility, leading to the provision of services that cannot be justified as medically necessary.

311.    The EEG and neurophysiological testing performed by Brain Diagnostics, specifically through the BrainScope, was not based on individualized medical necessity tailored to the specific symptoms, history, and physical examination findings of each patient. Instead, these services were part of a predetermined treatment protocol, designed to maximize billing rather than optimize patient care.

312.    C.Y. initially presented to GHHS on September 12, 2023, with headaches that were readily explained by musculoskeletal complaints, with no other physical, cognitive, or emotional symptoms typical of a mTBI explicitly noted. C.Y. did not report a head injury, loss of consciousness, or difficulty walking. His physical examination consistently pointed to non-neurological, musculoskeletal issues. The subsequent improvement in his headaches by October

3, 2023, further negated any genuine concern for a recent brain injury requiring BrainScope assessment.

313.    Despite the complete absence of clinical indicators for a mTBI, the BrainScope assessment was performed on September 28, 2023 – 26 days after the initial motor vehicle accident. This timing falls drastically outside the acute window in which the BrainScope device is FDA-cleared for head injury evaluation. Furthermore, C.Y.'s age of 48 years at the time of the assessment exceeds the cleared age range for the Concussion Index assessment provided by the device. These deviations from established clinical guidelines and the device's own parameters unequivocally demonstrate the lack of medical necessity.

314.    Regardless, the Brain Diagnostics submitted bills for C.Y.'s BrainScope services, totaling $5,000.00 for the EEG; and $2,700.00 for  neurophysiological testing.

315.    The medically unnecessary BrainScope testing, as exemplified by C.Y.'s case, is not an isolated incident but rather a routine and systemic practice imposed upon Allstate claimants. Dr. Magbag and Brain Diagnostics consistently administer these unwarranted tests without regard for individualized medical necessity, thereby generating fraudulent claims for services that provide no legitimate diagnostic or therapeutic benefit to the patients, but instead serve to inflate billing.

316.    By consistently administering and billing for medically unnecessary BrainScope services under the guise of legitimate diagnostic testing, Dr. Magbag and Brain Diagnostics have engaged in a fraudulent scheme designed to unlawfully enrich themselves at the expense of Allstate. Their actions demonstrate a pattern of misrepresenting the medical necessity of services and submitting inflated charges, all in furtherance of defrauding Allstate.

317.    Brain Diagnostics routinely and systematically billed Allstate for BrainScope services (under CPT Code 95816 and/or 96132) administered to numerous Allstate claimants.

These services were medically unnecessary, not performed in accordance with billing requirements, and/or lacked the required documentation, demonstrating a consistent pattern of fraudulent billing.

318.    None of the bills for BrainScope services (CPT Code 95816 and 96132) were necessary, including all of those identified in Exhibits 8-9. All of these fraudulent bills traveled through the U.S. Mail. Allstate relied on these bills when making payments.

> **b.    _Dr. Magbag's Unlawful Performance of EEG and Neurophysiological Testing_**

319.    The BrainScope testing performed on Allstate claimants was not only medically unnecessary, lacking genuine clinical indication and yielding no actionable diagnostic value, but also rendered unlawfully by Dr. Magbag, a chiropractor operating entirely outside his legal scope of practice and control, further establishing the fraudulent nature of the claims.

320.    Brain Diagnostics routinely submitted BrainScope Session Reports to Allstate for EEG and neurophysiological testing performed on Allstate claimants. Crucially, these reports consistently identified "Dr. Magbag" as the "Assessment Operator," unequivocally demonstrating that Dr. Magbag personally performed and analyzed these medical tests.

321.    Despite personally conducting these tests, as set out above, Dr. Magbag is licensed solely as a chiropractor in Texas. The scope of chiropractic practice, as strictly defined by Tex. Occ. Code Ann. § 201.002(b)(1)-(2), is narrowly limited to evaluating the musculoskeletal system and addressing the subluxation complex. EEG and neurophysiological testing falls demonstrably and entirely outside this authorized scope of chiropractic care. Dr. Magbag therefore lacked, and continues to lack, the legal authority, and qualifications to lawfully perform such medical examinations in the State of Texas.

322.    Allstate only uncovered this pervasive scheme, including the unlawful and fraudulent performance of medical tests by unqualified individuals like Dr. Magbag, after an extensive investigation into the Defendant businesses.

323.    Had Allstate known that Brain Diagnostics was, in fact, owned, controlled, and operated by an unqualified individual such as Dr. Magbag, rather than by a licensed medical doctor acting within their lawful scope, Allstate would have immediately ceased all payments. Such deliberate and systematic conduct is improper, unlawful, and renders all billing submitted to Allstate by Brain Diagnostics was fraudulent.

### F.    OTHER FRAUDULENT MEDICAL RECORDS AND BILLING

324.    As set out above, Section 105.002 of the Texas Occupations Code prohibits a healthcare provider, in connection with the providers professional activities, from knowingly presenting (or causing to be presented) a false or fraudulent claim for the payment of a loss under an insurance policy.

325.    Tex. Occ. Code § 105.002(a)(1)-(2) of the Texas Occupations Code also prohibits a healthcare provider, in connection with its professional services from knowingly preparing, making, or subscribing to any writing, with the intent to present or use the writing, or allow it to be presented or used, in support of a false or fraudulent claim under an insurance policy.

### 1.    Misrepresentations by Magbag East and Magbag Wellness – Forged Patient Signatures

326.    Dr. Magbag, through Magbag Wellness and Magbag East, systematically engaged in the forgery of Allstate claimants' signatures on critical medical records.

327.    These forged documents included sign-in sheets, which purport to authenticate patient visits and confirm that services documented were actually administered as represented.

328.    A meticulous review of chiropractic notes and sign-in sheets from Magbag East and Magbag Wellness reveals pervasive inconsistencies and significant variations in the signatures attributed to Allstate claimants across their various sessions.

329.    Furthermore, the placement and appearance of these fabricated signatures, often positioned at irregular angles and, in some instances, retaining extraneous text—clear remnants from the original source—strongly suggest a rudimentary "cut and paste" process carried out by the Defendants to create fraudulent documentation.

330.    These documents, containing forged signatures and material misrepresentations of fact, were then submitted to Allstate. Allstate, relying on the purported authenticity and accuracy of these records, was thereby fraudulently induced into paying for services that were either never rendered or were entirely fabricated.

331.    Allstate did not discover the Defendants' forgeries until shortly before filing this Complaint, despite its due diligence.

332.    By way of example, on April 3, 2023, Allstate claimant, M.S. (Claim No. 0708774138), was involved in a motor vehicle accident.

333.    M.S. visited Memorial Hermann Hospital System via a private vehicle on the same date as the accident. M.S. purportedly experienced mid and lower back pain, with no neurological symptoms and was discharged the same day, with a recommendation to follow-up with a primary care physician within a few days.

334.    M.S. was seen by the GHHS' nurse practitioners, Chua and Hampton, respectively on April 6, April 26, and May 10, 2023, at the address 10723 Schroeder Oak Ct, Houston, TX 77070.

335.    The medical notes from GHHS note that claimant, M.S., experienced pain in her left hip, left arm, right knee, and lower back. M.S.'s treatment plan included a referral for chiropractic therapy with Magbag East, a prescription for medications, and a referral for an MRI, and the administration of TPIs.

336.    GHHS charged $400.00 for the new patient office visit; $200.00 for each subsequent consultation; and $6,000.00 for each TPI.

337.    The prescription for medication was hand-filled by Chua on a pre-printed form bearing Family Pharmacy's letterhead.

338.    M.S. was subsequently subjected to, and allegedly received, 13 chiropractic therapy sessions at Magbag East's clinic, which were prescribed and documented not for genuine medical necessity, but rather to generate additional fraudulent billing.

339.    Magbag East submitted an invoice dated April 10, 2023 for all 13 sessions and a summary report of the treatment, bringing the invoice to $4,245.00.

340.    The invoices for M.S.'s chiropractic therapy at Magbag East included charges for extensive and unnecessary services, such as therapeutic exercise, ultrasound therapy, electric stimulation, massage therapy, and initial applications of heat/cold packs for nearly every session. This aggressive and prolonged treatment plan was pursued despite GHHS' medical notes reporting M.S.'s diagnosis as merely sprains of ligaments and tendons in the spine, neck, and back, and an MRI examination that explicitly revealed no abnormalities. This clear pattern of excessive billing for minor, non-structural injuries unequivocally aligns with the predetermined treatment protocol previously discussed, rather than an individualized, medically necessary course of care.

341.    Documentation of M.S.'s chiropractic therapy at Magbag East exhibited deliberate and pervasive deficiencies designed to obscure genuine patient care and facilitate fraudulent

billing. The initial examination form, although pre-printed, was hand-filled and largely illegible, including the purported provider's signature, thereby rendering the foundational assessment unverifiable.

342.    Furthermore, the daily progress notes, which listed Dr. Balogun as the provider, contained consistently suspicious patient signature lines for M.S., evidence that these were not authentic, claimant-affixed signatures for each alleged session, but rather fabrications intended to create a false record of treatment.

343.    A true and accurate record of M.S.'s authentic signature, set out below, appeared on her settlement release with Allstate dated February 19, 2024 (Claim No. 0708774138):



344.    This verified signature provides a stark and compelling contrast to the numerous and clearly fabricated signatures found throughout M.S.'s chiropractic notes and sign-in sheets submitted by Magbag East and Magbag Wellness.

345.    Examples of M.S.'s fabricated and inconsistent purported signatures appearing on the Magbag East chiropractic session documentation are depicted below (with partial redactions):



346.    The systematic forging, manipulation, and digital "pasting" of signatures is glaringly evident even in the redacted records of Allstate Claimant M.S.'s signatures from Magbag East chiropractic sessions.

347.    Allstate's investigation unequivocally confirmed that the signatures on M.S.'s chiropractic notes were not genuinely affixed by M.S. herself, but were instead forged and submitted by the Defendants.

348. This conclusive finding, coupled with the pervasive fraudulent conduct detailed above, irrefutably establishes that the Defendants engaged in a systematic pattern of material misrepresentation and falsification of records sent to Allstate.

349. The forging and manipulation of Allstate claimants' signatures on chiropractic session notes and other medical records, as exemplified in M.S.'s case, is not an isolated incident but constitutes a constant, pervasive, and systemic fraudulent practice employed by the Defendants across numerous Allstate claimants.

350. Had Allstate known that these crucial authentication documents contained fabricated or forged signatures, it would have never approved or issued any payments for services billed under such fraudulent documentation.

### 2. Billing for Services That Were Not Rendered

351. Beyond the other fraudulent practices detailed herein, the Defendants systematically billed for healthcare services that were not performed in the manner as represented in the submitted records and invoices. This pervasive misconduct included, but was not limited to, charging for phantom office visits, inflating the duration or complexity of treatments, and billing for procedures not actually performed on Allstate claimants.

352. For example, GHHS submitted, invoices to Allstate for services purportedly rendered to Allstate claimant C.V. (Claim No. 0643578925).

353. These invoices falsely claimed that two Trigger Point Injections (TPIs) were administered to C.V. on October 7 and October 21, 2021, respectively.

354. GHHS outrageously charged Allstate $6,000.00 for each TPI that was not provided, demonstrating a clear intent to defraud Allstate.

355.    A true and accurate excerpt of the fraudulent bill from GHHS regarding Allstate claimant C.V. (Claim No. 0643578925) for an office visit and injection on October 7, 2021 is depicted below:



356.    A true and accurate excerpt of the bill from GHHS regarding Allstate claimant, C.V., for an office visit and injection on October 21, 2021, is depicted below:



357.    Allstate, justifiably relying on the apparent truthfulness and accuracy of the invoices submitted by GHHS, paid monies in connection with these fraudulent bills.

358.    However, Allstate claimant C.V. confirmed under oath, on at least three separate occasions, that she visited GHHS only once to receive a single injection.

359.    True and accurate excerpts from Allstate claimant C.V.'s sworn statement dated February 20, 2024, are depicted below:



*    *    *

```
 9      Q.   Sure.  You went to a doctor at Greater Houston
10   Healthcare for injections, correct?
11      A.   Yes.
12      Q.   How many times did you go there?
13      A.   For the injection?
14      Q.   How many times did you go to that facility?
15      A.   I don't remember.
16      Q.   How many times did you get injections?
17      A.   One time.
```

*     *     *

```
                                      February 20, 2024
                                             Page 96

 1   correct, correct?
 2      A.   We got the injections on one day.
 3      Q.   Do you remember going back and getting
 4   injections on another day?
 5      A.   We only went once.
```

360.   The Defendants intentionally submitted fraudulent medical records and invoices for treatment not rendered to C.V.

361.   The Defendants intentionally falsified these records and invoices with the express purpose of inducing Allstate to rely on them and to make payments based on these fabricated documents.

362.   On information and belief, the Defendants' actions in C.V.'s case were not isolated incidents. Instead, the Defendants systematically and intentionally created and falsified records and invoices, including but not limited to those involving forged signatures and billing for services not rendered, with the express purpose of inducing Allstate to rely on them and to make payments.

363.    Had Allstate known the true nature of these fraudulent practices, including the intentional misrepresentations, falsified records, and invoices for services not rendered, it would have never issued any payments.

### 3.    Misrepresentations by Magbag East and Magbag Wellness – Falsely Identifying Treating Chiropractors

364.    The Defendants, Dr. Magbag, Magbag Wellness and Magbag East, by way of their employees and coconspirators engaged in a practice of creating false and deficient medical records, including summary reports and daily progress notes, which were not contemporaneously generated but rather formulated through guesswork, leading to fraudulent billing for services that were not rendered as represented or rendered at all, in direct violation of Texas law.

365.    The majority of summary reports for treatment submitted to Allstate by Magbag Wellness and Magbag East bear the signatures of both Dr. Balogun and Dr. Dudycha, chiropractors purportedly on Dr. Magbag's payroll and control.

366.    Despite the daily progress notes explicitly listing two providers, such as "Justin Dudycha D.C./Crystal Mesrahi D.C.," this dual listing did not reflect a clear allocation of responsibility.

367.    In fact, Dr. Magbag admitted under oath that the dual-provider reporting practice stemmed directly from uncertainty regarding which chiropractor actually oversaw the respective Allstate claimant for whom the records were being generated.

368.    This admission further reveals that the patient records were not created contemporaneously with the services rendered, thereby rendering them false.

369.    The false record-keeping practices are not merely administrative errors; they unequivocally demonstrate a scheme by GHHS to fraudulently bill for services that were not rendered.

370.    These practices constitute a direct and material violation of Texas law. This failure to adhere to established professional and contractual obligations further substantiates the fraudulent nature of the billing practices.

371.    A true and accurate excerpt of Dr. Magbag's deposition is set forth below:

```
 5          Q.  And this report, it's -- if we go down to
 6     Page 4, it's signed, "Sincerely, Justin Dudycha" and
 7     "Razak" -- I'm going to mispronounce it, probably,
 8     but -- "Balogun" or "Balogun"?
 9          A.  Yes.
10          Q.  Does that mean both of them were responsible
11     for producing this?
12          A.  No.  I believe -- I believe at the time
13     Dr. Balogun was also working at the facility, as well.
14     So, a lot of times, just in case, they both saw the
15     patients, but -- they're --
16              (Technical interruption.)
17          Q.  (BY MR. KENNAMER-CHAPMAN)  Sorry.  You cut
18     out.  Could you -- I, I heard "a, a lot of times," and
19     then it cut out a little bit.
20          A.  Basically, during that time both Dr. Balogun
21     and Dr. Dudycha were working at Magbag Wellness at the
22     time.
23          Q.  And you were telling me something along the
24     lines of they both signed -- that their -- both of
25     their names there are in case that --
```

\*      \*      \*

```
 1        A.  In case they were -- if -- in case they both
 2    saw the patient.
 3        Q.  Okay.
 4        A.  Because, like, even if -- even if they didn't
 5    do the evaluation, they might have, you know, seen the
 6    patient, treated, treated the patient at that -- at one
 7    of the visits.
 8        Q.  Okay.  And who is responsible for actually
 9    drafting this document?
10        A.  We have -- we have a staff member.  I would
11    have to ask my manager who actually drafted it, but
12    basically they draft it and they, they review it and
13    have the doctor coincide it with the records.
```

372.    Laypersons employed by the Defendants, whose specific identities and qualifications remain unclear, were directly responsible for creating patient reports for both Magbag East and Magbag Wellness. This practice constitutes the creation of official medical documentation by individuals not licensed or authorized to do so.

373.    Upon information and belief, these same laypersons employed by the Defendants were involved in administering medical modalities to patients. Crucially, their involvement in rendering these services was not accurately documented in the official patient records, concealing the true providers of care and raising serious concerns about the licensure and competence of individuals performing medical treatments.

374.    While Dr. Magbag superficially suggests that these layperson-created records were subsequently "reviewed" by his employed chiropractors, this claim is demonstrably false. This assertion is directly contradicted by Dr. Magbag's own sworn admission that he would include

both doctors' names on reports "just in case," a practice born from his acknowledged ignorance of who actually rendered the services.

375.    Had licensed chiropractors genuinely reviewed these records prior to their completion, they would have been in a position to confirm or deny their personal involvement in the patient's treatment, thereby exposing the fraudulent nature of the documentation.

376.    The cumulative effect of these practices is the systemic fabrication of medical records, intentionally obscuring the identity and licensure status of individuals performing the services. This deliberate concealment of the actual practitioners constitutes false claims for payment.

377.    These demonstrably fraudulent practices of placing the wrong treating chiropractor as a signatory to the treatment record were not isolated incidents but rather a pervasive and systematic pattern.

## V.    MATERIAL MISREPRESENTATIONS AND JUSTIFIABLE RELIANCE

### A.    MATERIAL MISREPRESENTATIONS MADE BY DEFENDANTS

378.    The Defendants submitted documentation that misrepresented and omitted material facts about the billed-for healthcare services to induce Allstate to pay the fraudulent charges for unlicensed, unlawful, and unnecessary healthcare services.

379.    The Defendants' fraudulent scheme involved billing for healthcare services for the benefit of Allstate claimants, based on (1) unlawful ownership and control; (2) unlawful referrals and kickbacks; (3) unnecessary healthcare services provided pursuant to a predetermined treatment protocol at grossly excessive charges; (4) billing for services that were not medically necessary; (5) billing for services that were not rendered as represented; and (6) billing for services based on forged and/or fabricated medical records.

380.    The Defendants' invoices were often issued accompanied by a false affidavit of accuracy by the custodian of records of the Defendant businesses.

381.    Yet, as alleged herein, the Defendants created and submitted records and bills on behalf of GHHS, Magbag Wellness, Magbag East, and Brain Diagnostics that contained false information or omitted pertinent information.

382.    The Defendants attested to the necessity of the billed healthcare services through these records and bills, which the Defendants mailed (or caused the mailing of false medical documentation) to Allstate using the U.S. Mail.

383.    Every record, bill, and lien created and mailed by the Defendants constitutes a material misrepresentation provided the records, bills, and liens relate to GHHS, Magbag Wellness, Magbag East, and Brain Diagnostics charges for services based on (1) unlawful ownership and control; (2) unlawful referrals and kickbacks; (3) unnecessary healthcare services provided pursuant to a predetermined treatment protocol at grossly excessive charges; (4) billing for services that were not medically necessary; (5) billing for services that were not rendered as represented; and (6) billing for services based on forged and/or fabricated medical records.

384.    The Defendants knew, and it was reasonably foreseeable, that their patients, or their patients' representatives, would submit the Defendants' bills, and related documentation, through the U.S. Mail when they sought claim-settlement payments from Allstate.

385.    In these instances, documents submitted to Allstate through the U.S. Mail included records and bills generated by the Defendants with respect to the Defendant businesses.

386.    As part of this scheme, Defendants intended for Allstate to act in reliance on the statements and representations contained in the records and bills.

387. In reasonable reliance on the statements and representations contained in the records and bills, Allstate did in fact tender payment to GHHS, Magbag Wellness, Magbag East, and Brain Diagnostics.

## B. ALLSTATE'S JUSTIFIABLE RELIANCE

388. As the Defendants did not render lawful and reasonably necessary medical treatment, each bill and lien and accompanying documentation mailed by or on behalf of the Defendants to Allstate constitutes a material misrepresentation.

389. Each claim submitted to Allstate by (or on behalf of) GHHS, Magbag Wellness, Magbag East, and Brain Diagnostics represented that the Defendants were legally eligible to be reimbursed.

390. The facially valid documents submitted to Allstate by the Defendants were designed to, and did in fact, induce Allstate to rely on the documents.

391. Allstate believed the Defendants bills and records (including the misrepresentations in every claim), which were submitted through the ordinary course of business.

392. Thus, Allstate reasonably and justifiably relied on those representations in the bills and records when making payments, as these were the primary, if not only, basis Allstate was provided to make payments to the Defendants.

393. Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the Defendants, revealing the true nature and full scope of their fraudulent scheme.

## C. THE DEFENDANTS' KNOWLEDGE AND INTENT

394. The Defendants knew that the medical bills that contained false representations would be submitted by claimants and/or their counsel to Allstate seeking payments.

395.    Indeed, this was the Defendants specific intent—that Allstate would believe and rely on these false statements in the Defendants' medical records to induce it to make payments.

396.    The sole purpose of the Defendants making material misrepresentations in their medical bills and records was to steal from Allstate.

397.    Indeed, Allstate was a direct target of the Defendants' fraud scheme.

398.    At all relevant times, the Defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of treatment and services allegedly provided by them to prevent Allstate from discovering that the claims submitted by and on behalf of the Defendants were fraudulent under Texas law.

399.    These misrepresentations include submitting false medical documentation, including invoices, documenting the fact, lawfulness, and necessity of medical treatment and services in order to seek payment from Allstate.

**D.    INJURY**

400.    Due to the Defendants' material misrepresentations and affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

401.    In reliance on and as a result of the Defendants' misrepresentations, Allstate paid money to the defendants to its detriment—monies that Allstate otherwise would not have paid if the Defendants had provided true and accurate information.

402.    As a result, Allstate has paid in excess of $1,438,170.99 based upon the Defendants' false documentation and invoices.

## VI.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

403.    Throughout the course of this scheme, the Defendants agreed and routinely created, prepared and submitted (or caused to be created, prepared, and submitted) false medical documentation and intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing (or causing to be placed) in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Services, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

404.    The Defendants prepared fraudulent bills, liens and supporting medical documentation to send directly to Allstate, and/or to personal injury attorneys, who in turn, included the fraudulent bills and records in demand packages submitted through the U.S. Mail to Allstate (as the insurers of the allegedly at fault driver in the underlying automobile accident).

405.    The Defendants knew that personal injury attorneys would then use the bills and records to extract payments from Allstate.

406.    The Defendants knew Allstate would make payments on the claims based on the fraudulent bills and records, and Allstate used the U.S. Mail to send the payments.

407.    Unless otherwise pled to the contrary, all documents, invoices, liens, narrative reports, letters, and requests for payments in connection with the insurance claims referenced throughout the balance of this Complaint traveled through the U.S. Mail.

408.    Every automobile insurance claim detailed herein involved at least two uses of the U.S. Mail, including the mailing of invoices, medical records, invoices, narrative reports, and payments, and caused various other mailings in the ordinary course of the claims process.

A.    **GHHS**

409.    Dr. Magbag, Dr. Alan Tran, and Vi Tran and other GHHS providers and staff took part in the creation, operation, and control of GHHS for the purpose of generating fraudulent reports and invoices.

410.    These Defendants enriched themselves through the submission of fraudulent bills to Allstate claimants for unnecessary and unlawful services.

411.    GHHS, through the operation and control by Dr. Magbag, Dr. Alan Tran, and Vi Tran, was the means by which the Defendants caused the fraudulent invoices of GHHS to be submitted to Allstate claimants and Allstate through the U.S. Mail.

412.    Dr. Magbag, Dr. Alan Tran, and Vi Tran personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing invoices, liens and records from GHHS to be mailed to Allstate and/or counsel for claimants, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

413.    Dr. Magbag, Dr. Alan Tran, and Vi Tran falsely certified that GHHS was, in all respects, eligible to be reimbursed under applicable state and federal law each time that GHHS mailed a demand for payment (i.e., invoice) for claims related to Allstate claimants.

414.    Persons acting under Dr. Magbag, Dr. Alan Tran, and Vi Tran's direction and control provided unnecessary medical services to Allstate claimants, and generated fraudulent invoices as a result, which rendered GHHS completely ineligible for reimbursement under state and federal law.

415.    Because GHHS was not lawfully eligible to seek or collect benefit payments under state and federal law, Dr. Magbag, Dr. Alan Tran, and Vi Tran purposely caused GHHS to make

a misrepresentation each and every time that GHHS mailed a document to Allstate claiming eligibility for reimbursement.

416.    Dr. Magbag, Dr. Alan Tran, and Vi Tran committed mail fraud through the GHHS enterprise because: (a) GHHS was not lawfully eligible to seek or collect benefit payments; (b) GHHS was caused to seek reimbursement from Allstate even though GHHS was not entitled to such reimbursement; and (c) GHHS used (or was caused to use) the U.S. Mail to seek reimbursement.

417.    At all relevant times, Dr. Magbag, Dr. Alan Tran, and Vi Tran knew that GHHS (including its employees, owner(s), contractors, and agents), a claimant, an insurance carrier, claimant's attorney, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by GHHS.

418.    Allstate estimates that the unlawful operation of the GHHS enterprise generated hundreds of mailings throughout the relevant time period.

419.    A table highlighting the relevant examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 10 and incorporated by reference as if set forth in its entirety.

## B.    MAGBAG WELLNESS

420.    Dr. Magbag and Magbag Wellness providers and staff took part in the creation, operation, and control of Magbag Wellness for the purpose of generating fraudulent reports and invoices.

421.    These Defendants enriched themselves through the submission of fraudulent bills to Allstate claimants for unnecessary and unlawful services.

422.    Magbag Wellness, through the operation and control by Dr. Magbag, was the means by which the Defendants caused Magbag Wellness's fraudulent invoices to be submitted to Allstate claimants and Allstate through the U.S. Mail.

423.    Dr. Magbag and Magbag Wellness providers and staff personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing invoices and records from Magbag Wellness to be mailed to Allstate and/or counsel for claimants, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

424.    Dr. Magbag caused Magbag Wellness to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal law each time that Magbag Wellness mailed a demand for payment (i.e., invoice) to Allstate.

425.    Persons acting under Dr. Magbag's direction and control provided unnecessary medical services to Allstate claimants, and generated fraudulent invoices as a result, which rendered Magbag Wellness completely ineligible for reimbursement under state and federal law.

426.    Because Magbag Wellness was not lawfully eligible to seek or collect benefit payments under state and federal law, Dr. Magbag purposely caused Magbag Wellness to make a misrepresentation each and every time that Magbag Wellness mailed a document to Allstate claiming eligibility for reimbursement.

427.    Dr. Magbag committed mail fraud through the Magbag Wellness enterprise because: (a) Magbag Wellness was not lawfully eligible to seek or collect benefit payments; (b) Magbag Wellness was caused to seek reimbursement from Allstate even though Magbag Wellness was not entitled to such reimbursement; and (c) Magbag Wellness used (or was caused to use) the U.S. Mail to seek reimbursement.

428.    At all relevant times, Dr. Magbag knew that Magbag Wellness (including its employees, owner(s), contractors, and agents), a claimant, an insurance carrier, claimant's attorney, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Magbag Wellness.

429.    Allstate estimates that the unlawful operation of the Magbag Wellness enterprise generated hundreds of mailings throughout the relevant time period.

430.    A table highlighting the relevant examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 11 and incorporated by reference as if set forth in its entirety.

## C.    MAGBAG EAST

431.    Dr. Magbag and other Magbag East providers and staff took part in the creation, operation, and control of Magbag East for the purpose of generating fraudulent reports and invoices.

432.    These Defendants enriched themselves through the submission of fraudulent bills to Allstate claimants for unnecessary and unlawful services.

433.    Magbag East, through the operation and control by Dr. Magbag was the means by which the Defendants caused Magbag East fraudulent invoices to be submitted to Allstate claimants and Allstate through the U.S. Mail.

434.    Dr. Magbag personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing invoices and records from Magbag East to be mailed to Allstate and/or counsel for claimants, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

435. Dr. Magbag caused Magbag East to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal law each time that Magbag East mailed a demand for payment (i.e., invoice) to Allstate.

436. Persons acting under Dr. Magbag's direction and control provided unnecessary medical services to Allstate claimants and generated fraudulent invoices as a result, which rendered Magbag East completely ineligible for reimbursement under state and federal law.

437. Because Magbag East was not lawfully eligible to seek or collect benefit payments under state and federal law, Dr. Magbag purposely caused Magbag East to make a misrepresentation each and every time that Magbag East mailed a document to Allstate claiming eligibility for reimbursement.

438. Dr. Magbag committed mail fraud through the Magbag East enterprise because: (a) Magbag East was not lawfully eligible to seek or collect benefit payments; (b) Magbag East was caused to seek reimbursement from Allstate even though Magbag East was not entitled to such reimbursement; and (c) Magbag East used (or was caused to use) the U.S. Mail to seek reimbursement.

439. At all relevant times, Dr. Magbag knew that Magbag East (including its employees, owner(s), contractors, and agents), a claimant, an insurance carrier, claimant's attorney, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Magbag East.

440. Allstate estimates that the unlawful operation of the Magbag East enterprise generated hundreds of mailings throughout the relevant time period.

441. A table highlighting the relevant examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 12 and incorporated by reference as if set forth in its entirety.

### D.    **BRAIN DIAGNOSTICS**

442.    Dr. Magbag took part in the creation, operation, and control of Brain Diagnostics for the purpose of generating fraudulent reports and invoices.

443.    The Defendants enriched themselves through the submission of fraudulent bills to Allstate claimants for unnecessary and unlawful services.

444.    Brain Diagnostics, through the operation and control by Dr. Magbag, was the means by which the Defendants agreed to and caused Brain Diagnostics' fraudulent invoices to be submitted to Allstate claimants and Allstate through the U.S. Mail.

445.    Dr. Magbag personally used the U.S. Mail (or caused the U.S. Mail to be used) to further this fraudulent scheme by causing invoices and records from Brain Diagnostics to be mailed to Allstate and/or counsel for claimants, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

446.    Dr. Magbag caused Brain Diagnostics to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal law each time that Brain Diagnostics mailed a demand for payment (i.e., invoice) to Allstate.

447.    Persons acting under Dr. Magbag's direction and control provided unnecessary medical services to Allstate claimants,  and generated fraudulent invoices as a result, which rendered Brain Diagnostics completely ineligible for reimbursement under state and federal law.

448.    Because Brain Diagnostics was not lawfully eligible to seek or collect benefit payments under state and federal law, Dr. Magbag purposely caused Brain Diagnostics to make a misrepresentation each and every time that Brain Diagnostics mailed a document to Allstate claiming eligibility for reimbursement.

449.    Dr. Magbag committed mail fraud through the Brain Diagnostics enterprise because: (a) Brain Diagnostics was not lawfully eligible to seek or collect benefit payments; (b) Brain Diagnostics was caused to seek reimbursement from Allstate even though Brain Diagnostics was not entitled to such reimbursement; and (c) Brain Diagnostics used (or was caused to use) the U.S. Mail to seek reimbursement.

450.    At all relevant times, Dr. Magbag knew that Brain Diagnostics (including its employees, owner(s), contractors, and agents), a claimant, an insurance carrier, claimant's attorney, and/or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Brain Diagnostics.

451.    Allstate estimates that the unlawful operation of the Brain Diagnostics enterprise generated hundreds of mailings throughout the relevant time period.

452.    A table highlighting the relevant examples of mailings made in furtherance of this scheme is annexed hereto at Exhibit 13 and incorporated by reference as if set forth in its entirety.

## VII.    SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

### A.    GHHS – FRAUDULENT CONCEALMENT

453.    At all relevant times during the operation of the GHHS enterprise, Dr. Magbag, Dr. Alan Tran, and Vi Tran purposely caused GHHS to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal laws as a means to induce Allstate to promptly pay charges related to false, fraudulent, and unnecessary medical services purportedly provided to Allstate claimants.

454.     Dr. Magbag, Dr. Alan Tran, and Vi Tran (along with those individuals working under their control) purposely concealed the lack of necessity for the medical services purportedly provided and charged for by GHHS.

455.     Dr. Magbag, Dr. Alan Tran, and Vi Tran (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) records that falsely purported to justify the necessity of the medical services purportedly provided by GHHS to Allstate claimants.

456.     Dr. Magbag, Dr. Alan Tran, and Vi Tran were responsible for: (a) directing the fraudulent services purportedly rendered on behalf of Allstate claimants through GHHS; (b) creating, altering, and/or fabricating records submitted to Allstate in support of services purportedly rendered on behalf of Allstate claimants; (c) billing Allstate for the fraudulent medical services purportedly rendered on behalf of Allstate claimants through GHHS; and (d) falsely charging for the services with the knowledge that these services were not lawfully reimbursable under applicable laws, GHHS was caused to falsely claim eligibility each and every time that GHHS sought reimbursement from Allstate.

457.     As alleged above, Dr. Magbag, Dr. Alan Tran, and Vi Tran (or those persons working under their control) caused GHHS to create and submit to Allstate claim reimbursement documents and demands for payment relative to services that were: (a) unlawful; (b) unnecessary; (c) fraudulent; and/or (d) not actually provided as represented.

458.     Such conduct is unlawful, and rendered each such claim fraudulent under applicable state and federal laws.

459.     Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services unlawfully provided, are not readily evident within the four corners of the

documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete claim at issue in this matter.

460.    Thus, every time that Dr. Magbag, Dr. Alan Tran, and Vi Tran (along with those individuals working under their control) caused GHHS to submit reimbursement demands to Allstate, Dr. Magbag, Dr. Alan Tran, and Vi Tran (and those individuals working under their control) necessarily certified that GHHS was, in all respects, eligible to be reimbursed under applicable state and federal laws.

461.    Specifically, each claim submitted to Allstate was accompanied by a notarized affidavit from the respective keeper of records of GHHS at the time, certifying that the services were necessary and that the amount charged was reasonable.

462.    A true and accurate example of a notarized affidavit by the keeper of records of GHHS, namely Crystal Trevino, in relation to invoices and medical records submitted in respect of Allstate claimant E.M. (Claim No. 0712833730) is annexed hereto at Exhibit 14.

463.    The full extent of Dr. Magbag, Dr. Alan Tran, and Vi Tran's fraudulent and unlawful acts relative to their participation in the GHHS enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

**B.    MAGBAG WELLNESS – FRAUDULENT CONCEALMENT**

464.    At all relevant times during the operation of the Magbag Wellness enterprise, Dr. Magbag purposely caused Magbag Wellness to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal laws as a means to induce Allstate to promptly pay charges related to false, fraudulent, and unnecessary medical services purportedly provided to Allstate claimants.

465.    Dr. Magbag (along with those individuals working under his control) purposely concealed the lack of necessity for the medical services purportedly provided and charged for by Magbag Wellness.

466.    Dr. Magbag (or those working under his direction and control) created and submitted to Allstate (or caused the creation and submission of) records that falsely purported to justify the necessity of the medical services purportedly provided by Magbag Wellness to Allstate claimants.

467.    Because Dr. Magbag was responsible for: (a) directing the fraudulent services purportedly rendered on behalf of Allstate claimants through Magbag Wellness; (b) creating, altering, and/or fabricating records submitted to Allstate in support of services purportedly rendered on behalf of Allstate claimants; (c) billing Allstate for the fraudulent medical services purportedly rendered on behalf of Allstate claimants through Magbag Wellness; (d) falsely charging for the services with the knowledge that these services were not lawfully reimbursable under applicable laws; and (e) billing Allstate for services that were, in most instances, never actually rendered as represented, Magbag Wellness was caused to falsely claim eligibility each and every time that Magbag Wellness sought reimbursement from Allstate.

468.    As alleged above, Dr. Magbag (or those persons working under his control) caused Magbag Wellness to create and submit to Allstate claim reimbursement documents and demands for payment relative to services purportedly provided by Magbag Wellness that were: (a) unlawful; (b) unnecessary; (c) fraudulent; and/or (d) not actually provided as represented.

469.    Such conduct is unlawful, and rendered each such claim fraudulent under applicable state and federal laws.

470.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services that were unlawful, are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete claim at issue in this matter.

471.    Thus, every time that Dr. Magbag (along with those individuals working under his control) caused Magbag Wellness to submit reimbursement demands in connection with Allstate claimants, Dr. Magbag necessarily certified that Magbag Wellness was, in all respects, eligible to be reimbursed under applicable state and federal laws.

472.    The full extent of Dr. Magbag's fraudulent and unlawful acts relative to his participation in the Magbag Wellness enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### C.    MAGBAG EAST – FRAUDULENT CONCEALMENT

473.    At all relevant times during the operation of the Magbag East enterprise, Dr. Magbag purposely caused Magbag East to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal laws as a means to induce Allstate to promptly pay charges related to false, fraudulent, and unnecessary medical services purportedly provided to Allstate claimants.

474.    Dr. Magbag (along with those individuals working under his control) purposely concealed the lack of necessity for the medical services purportedly provided and charged for by Magbag East.

475.    Dr. Magbag (or those working under his direction and control) created and submitted to Allstate (or caused the creation and submission of) records that falsely purported to

justify the necessity of the medical services purportedly provided by Magbag East to Allstate claimants.

476.    Because Dr. Magbag were responsible for: (a) directing the fraudulent services purportedly rendered on behalf of Allstate claimants through Magbag East; (b) creating, altering, and/or fabricating records submitted to Allstate in support of services purportedly rendered on behalf of Allstate claimants; (c) billing Allstate for the fraudulent medical services purportedly rendered on behalf of Allstate claimants through Magbag East; and (d) falsely charging for the services with the knowledge that these services were not lawfully reimbursable under applicable laws, Magbag East was caused to falsely claim eligibility each and every time that Magbag East sought reimbursement from Allstate.

477.    As alleged above, Dr. Magbag (or those persons working under his control) caused Magbag East to create and submit to Allstate claim reimbursement documents and demands for payment relative to services purportedly provided by Magbag East that were: (a) unlawful; (b) unnecessary; (c) fraudulent; and/or (d) not actually provided as represented.

478.    Such conduct is unlawful, and rendered each such claim fraudulent under applicable state and federal laws.

479.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services unlawfully rendered, are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete claim at issue in this matter.

480.    Thus, every time Dr. Magbag (along with those individuals working under his control) caused Magbag East to submit reimbursement demands to Allstate, Dr. Magbag (and those

individuals working under his control) necessarily certified that Magbag East was, in all respects, eligible to be reimbursed under applicable state and federal laws.

481.    The full extent of Dr. Magbag's fraudulent and unlawful acts relative to their participation in the Magbag East enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

**D.    BRAIN DIAGNOSTICS – FRAUDULENT CONCEALMENT**

482.    At all relevant times during the operation of the Brain Diagnostics enterprise, Dr. Magbag purposely caused Brain Diagnostics to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal laws as a means to induce Allstate to promptly pay charges related to false, fraudulent, and unnecessary medical services purportedly provided to Allstate claimants.

483.    Dr. Magbag (along with those individuals working under his control) purposely concealed the lack of necessity for the medical services purportedly provided and charged for by Brain Diagnostics.

484.    Dr. Magbag (or those working under his direction and control) created and submitted to Allstate (or caused the creation and submission of) records that falsely purported to justify the necessity of the medical services purportedly provided by Brain Diagnostics to Allstate claimants.

485.    Because Dr. Magbag were responsible for: (a) directing the fraudulent services purportedly rendered on behalf of Allstate claimants through Brain Diagnostics; (b) creating, altering, and/or fabricating records submitted to Allstate in support of services purportedly rendered on behalf of Allstate claimants; (c) billing Allstate for the fraudulent medical services purportedly rendered on behalf of Allstate claimants through Brain Diagnostics; and (d) falsely

charging for the services with the knowledge that these services were not lawfully reimbursable under applicable laws, Brain Diagnostics was caused to falsely claim eligibility each and every time that Brain Diagnostics sought reimbursement from Allstate.

486.    As alleged above, Dr. Magbag (or those persons working under his control) caused Brain Diagnostics to create and submit to Allstate claim reimbursement documents and demands for payment relative to services purportedly provided by Brain Diagnostics that were: (a) unlawful; (b) unnecessary; (c) fraudulent; and/or (d) not actually provided as represented.

487.    Such conduct is unlawful, and rendered each such claim fraudulent under applicable state and federal laws.

488.    Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services that were unlawfully rendered, are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete claim at issue in this matter.

489.    Thus, every time that Dr. Magbag (along with those individuals working under his control) caused Brain Diagnostics to submit reimbursement demands to Allstate, Dr. Magbag (and those individuals working under his control) necessarily certified that Brain Diagnostics was, in all respects, eligible to be reimbursed under applicable state and federal laws.

490.    The full extent of Dr. Magbag's fraudulent and unlawful acts relative to his participation in the Brain Diagnostics enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## VIII.  **DAMAGES**

491.    Allstate's damages calculation includes those monies that it paid to Defendants in connection with first-party insurance claims.

492.    In addition, Allstate's damage calculation includes monies that it intended would be paid to the Defendants from the payments made to bodily-injury claimants.

493.    Allstate does not seek damages for anything more than what it considered to be due and payable to the Defendants based on its reliance on the Defendants' bills and records.

494.    At the time it made these payments, Allstate was not aware of the fraud scheme alleged herein despite its reasonable due diligence because the Defendants went to great lengths to fraudulently conceal their scheme.

495.    Had Allstate not been misled by the representations contained in the Defendants' documentation, no payments would have been made on these claims.

496.    All of the payments were made based on the Defendants' material misrepresentations.

497.    None of the payments identified in Exhibits 15-21 were for legitimate healthcare services.

498.    There is a direct relationship between the amount of the Defendants' fraudulent bills and the amount paid to claimants. *See* Exhibits 15-21.

499.    Indeed, Allstate intended and the Defendants did, in fact, receive these payments identified in Exhibits 15-21.

500.    In addition, the Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate its damages with specificity at this stage of the litigation

(whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments wrongfully made to GHHS, Magbag Wellness, Magbag East, and Brain Diagnostics in connection with claims made under applicable state laws, the exact amount to be determined at trial, including:

- Payments made to GHHS by Allstate in connection with first-party claims (totaling at least $18,997.13) as well as monies received by GHHS that were derived directly from Allstate's payments tendered in connection with the payment of third-party bodily injury claims (totaling at least $610,724.33), the exact amount to be determined at trial. The charts at Exhibits 15-16, incorporated herein as if set forth in its entirety, identifies Allstate's first-party payments to GHHS in connection with claims determined to be false and fraudulent as of the filing of this Complaint and the monies received by GHHS as a direct result of Allstate's payment of third-party claims that have been determined to be fraudulent as of the filing of this Complaint.

- Payments made to Magbag Wellness by Allstate in connection with first-party claims (totaling at least $20,241.49) as well as monies received by Magbag Wellness that were derived directly from Allstate's payments tendered in connection with the payment of third-party bodily injury claims (totaling at least $361,208.24), the exact amount to be determined at trial. The charts at Exhibits 17-18, incorporated herein as if set forth in its entirety, identifies Allstate's first-party payments to Magbag Wellness in connection with claims determined to be false and fraudulent as of the filing of this Complaint and the monies received by Magbag Wellness as a direct result of Allstate's payment of third-party claims that have been determined to be fraudulent as of the filing of this Complaint.

- Payments made to Magbag East by Allstate in connection with first-party claims (totaling at least $23,550.52) as well as monies received by Magbag East that were derived directly from Allstate's payments tendered in connection with the payment of third-party bodily injury claims (totaling at least $391,196.56), the exact amount to be determined at trial. The charts at Exhibits 19-20, incorporated herein as if set forth in its entirety, identifies Allstate's first-party payments to Magbag East in connection with claims determined to be false and fraudulent as of the filing of this Complaint and the monies received by Magbag East as a direct result of Allstate's payment of third-party claims that have been determined to be fraudulent as of the filing of this Complaint.

- Payments made to Brain Diagnostics by Allstate in connection with third-party bodily injury claims totaled at least $12,252.72, the exact amount to be determined at trial. The chart at Exhibit 21, incorporated herein as if set forth in its entirety, identifies monies received by Brain Diagnostics as a direct result of Allstate's payment of third-party claims that have been determined to be fraudulent as of the filing of this Complaint.

## IX.     CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (GHHS Enterprise)
### (Against Jose Magbag, D.C., Alan Tran, D.C., Vi Tran, CNP, Magbag Wellness, Magbag East, and Brain Diagnostics)

501.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-500 as if set forth fully herein.

502.     GHHS constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

503.     In connection with each of the claims identified in the within Complaint, Dr. Magbag, Dr. Alan Tran, Vi Tran,  Magbag Wellness, Magbag East, and Brain Diagnostics (collectively, the "Count I Defendants"), all of whom are controlling administrative and or medical aspects of the GHHS, intentionally caused to be prepared and mailed false medical documentation by GHHS, or knew that such false medical documentation would be mailed in the ordinary course of GHHS' business, or should have reasonably foreseen the mailing of such false documentation by GHHS and/or by a personal injury attorney on behalf of a patient of GHHS would occur, in furtherance of the Count I Defendants' scheme to defraud.

504.     The Count I Defendants worked together to advance the alleged racketeering operation.

505.     The Count I Defendants owned, operated, and controlled and/or fraudulently represented that they had co-ownership or control of GHHS. They created and/or facilitated the creation of false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all.

506.    The Count I Defendants, through GHHS, participated in an improper and unlawful patient referral scheme with Magbag Wellness, Magbag East, and Brain Diagnostics.

507.    Specifically, Allstate claimants first presented at GHHS and were subsequently referred for chiropractic care at Magbag Wellness or Magbag East and for brain injury services at Brain Diagnostics in furtherance of the predetermined treatment protocol.

508.    By actively fulfilling their roles in the predetermined treatment protocol, which included unnecessary and unlawful billing, the Count I Defendants participated in the GHHS Enterprise that was used as a vehicle to steal Allstate's money.

509.    This allowed GHHS to continue to oversee the reported treatment at Magbag East, Magbag Wellness, and Brain Diagnostics to provide GHHS to bill for continued unnecessary healthcare services.

510.    Had the Count I Defendants refrained from participating in the scheme, then practitioners at GHHS would not have been able to carry out the unnecessary and unlawful medical treatments of Allstate Claimants.

511.    Had Defendants, Dr. Magbag, Dr. Alan Tran, Vi Tran, Magbag Wellness, Magbag East, and Brain Diagnostics chosen not to participate in the referral scheme with GHHS, then GHHS would not have been able to submit false records and invoices to the Allstate claimants as is set out in Exhibits 15-16.

512.    The objective of the GHHS Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

513.     The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate by submitting false medical documentation through the U.S. Mail to induce Allstate to rely on the Defendants' misrepresentations to make payments.

514.     The Count I Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

515.     Allstate would not have allocated payments for the Defendants' medical bills if it knew that the Defendants' medical documentation was fraudulent.

516.     The Count I Defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 10.

517.     The Count I Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by GHHS, which they knew would be billed by GHHS, and submitted to Allstate by GHHS and/or by a personal injury attorney on behalf of a patient of GHHS, in order to collect payment from Allstate.

518.     As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to GHHS for the benefit of the Count I Defendants that would not otherwise have been made.

519.     The Count I Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I Defendants to continue this unlawful scheme without being detected.

520.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

521.    The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to GHHS for the benefit of the Count I Defendants.

522.    The Count I Defendants participated in the conduct of the GHHS enterprise through a pattern of racketeering activities.

523.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

524.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

525.    Allstate (and all Plaintiffs individually) is in the business of writing insurance and paying claims in the State of Texas.

526.    By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (GHHS Enterprise)
### (Against Jose Magbag, D.C., Alan Tran, M.D., Vi Tran, CNP, Magbag Wellness, Magbag East, and Brain Diagnostics)

527.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-500 as if set forth fully herein.

528.    Dr. Magbag, Dr. Alan Tran, Vi Tran, Magbag Wellness, Magbag East, and Brain Diagnostics (collectively, the "Count II Defendants") conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of GHHS.

529.    The Count II Defendants worked together to advance the alleged racketeering operation.

530.    The Count II Defendants operated and controlled GHHS. They created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all.

531.    The Count II Defendants, through GHHS, participated in an improper and unlawful patient referral scheme with Magbag Wellness, Magbag East, and Brain Diagnostics.

532.    Specifically, Allstate claimants first presented at GHHS and were subsequently referred for chiropractic care  at Magbag Wellness or Magbag East and for brain injury services at Brain Diagnostics in furtherance of the predetermined treatment protocol.

533.    By actively fulfilling their roles in the predetermined treatment protocol, which included unnecessary and unlawful billing, the Count II Defendants participated in the GHHS Enterprise that was used as a vehicle to steal Allstate's money.

534.    This allowed GHHS to continue to oversee the reported treatment at Magbag East, Magbag Wellness, and Brain Diagnostics to provide GHHS to bill for continued unnecessary healthcare services.

535.    The objective of the GHHS Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

536.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate by submitting false medical documentation though the U.S. Mail to induce Allstate to rely on the Defendants misrepresentations to make payments.

537.    The Count II Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

538.    The Count II Defendants predicate acts themselves create a threat of continued unlawful activity extending into the future.

539.    Allstate would not have allocated payments for the Defendants' medical bills if it knew that the Defendants' medical documentation was fraudulent.

540.    The Count II Defendants agreed to further, facilitate, support, and operate the GHHS enterprise.

541.    As such, the Count II Defendants conspired to violate 18 U.S.C. § 1962(c).

542.    The purpose of the conspiracy was to obtain payments from Allstate for healthcare services provided to patients through GHHS even though GHHS was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count II Defendants.

543.    The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of GHHS, the provision of false, fraudulent, and unnecessary healthcare services to GHHS patients, and the creation and submission to Allstate of false medical documentation that materially misrepresented GHHS's reimbursement eligibility.

544.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make payments to (or for the benefit of) GHHS as a result of the Count II Defendants' unlawful conduct described herein.

545. By virtue of the Count II Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

### COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Magbag Wellness Enterprise)
### (Against GHHS, Dr. Magbag, and Vi Tran)

546. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-500 as if set forth fully herein.

547. Magbag Wellness constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

548. In connection with each of the claims identified within the Complaint, GHHS, Dr. Magbag, and Vi Tran (collectively, the "Count III Defendants") intentionally caused to be prepared and mailed false medical documentation by Magbag Wellness, or knew that such false medical documentation would be mailed in the ordinary course of Magbag Wellness's business, or should have reasonably foreseen the mailing of such false documentation by Magbag Wellness and/or by a personal injury attorney on behalf of a patient of Magbag Wellness would occur, in furtherance of the Count III Defendants' scheme to defraud.

549. The Count III Defendants worked together to advance the alleged racketeering operation.

550. Defendant, Dr. Magbag, owned, operated and controlled Magbag Wellness. He created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all.

551.    Vi Tran made referrals to Magbag Wellness to allow it to fulfill its role in the unlawful fraud scheme and extract monies from Allstate.

552.    Defendants GHHS, Dr. Magbag, and Vi Tran participated in an improper and unlawful patient referral scheme with Magbag Wellness.

553.    Had Defendants, GHHS, Dr. Magbag, and Vi Tran chosen not to participate in the referral scheme with Magbag Wellness, then Magbag Wellness would not have been able to submit false records and invoices to the Allstate claimants as is set out in Exhibits 17-18.

554.    The objective of the Magbag Wellness Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

555.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate by submitting false medical documentation though the U.S. Mail to induce Allstate to rely on the Defendants misrepresentations to make payments.

556.    The Count III Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

557.    Allstate would not have allocated payments for the Defendants' medical bills if it knew that the Defendants' medical documentation was fraudulent.

558.    The Count III Defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 11.

559.    The Count III Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Magbag Wellness, which they knew would be billed by Magbag

Wellness, and submitted to Allstate by Magbag Wellness and/or by a personal injury attorney on behalf of a patient of Magbag Wellness, in order to collect payment from Allstate.

560.     As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Magbag Wellness for the benefit of the Count III Defendants that would not otherwise have been made.

561.     The Count III Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III Defendants to continue this unlawful scheme without being detected.

562.     By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

563.     The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Magbag Wellness for the benefit of the Count III Defendants.

564.     The Count III Defendants participated in the conduct of the Magbag Wellness enterprise through a pattern of racketeering activities.

565.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

566.     The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

567.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Texas.

568.     By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT IV**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Magbag Wellness Enterprise)**
**(Against GHHS, Dr. Magbag, and Vi Tran)**

569.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-500 as if set forth fully herein.

570.     GHHS, Dr. Magbag, and Vi Tran (collectively, the "Count IV Defendants") conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Magbag Wellness.

571.     The Count IV Defendants worked together to advance the alleged racketeering operation.

572.     Defendant, Dr. Magbag operated and controlled Magbag Wellness.  He created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all.

573.     Vi Tran made referrals to Magbag Wellness to allow it to fulfill its role in the unlawful fraud scheme and extract monies from Allstate.

574.     Defendants GHHS, Dr. Magbag, and Vi Tran, related to Magbag Wellness, participated in an improper and unlawful patient referral scheme wherein Magbag Wellness were paid by the Defendants GHHS, Dr. Magbag, and Vi Tran in cash or kind, for patient referrals.

575.     Had Defendants, GHHS, Dr. Magbag, and Vi Tran chosen not to participate in the referral scheme with Magbag Wellness, then Magbag Wellness would not have been able to submit false records and invoices to the Allstate claimants as is set out in Exhibits 17-18.

576.     The objective of the Magbag Wellness Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

577.     The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate by submitting false medical documentation though the U.S. Mail to induce Allstate to rely on the Defendants misrepresentations to make payments.

578.     The Count IV Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

579.     The Count IV Defendants predicate acts themselves create a threat of continued unlawful activity extending into the future.

580.     Allstate would not have allocated payments for the Defendants' medical bills if it knew that the Defendants' medical documentation was fraudulent.

581.     The Count IV Defendants agreed to further, facilitate, support, and operate the Magbag Wellness enterprise.

582.     As such, the Count IV Defendants conspired to violate 18 U.S.C. § 1962(c).

583.     The purpose of the conspiracy was to obtain payments from Allstate for healthcare services provided to patients through Magbag Wellness even though Magbag Wellness was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count IV Defendants.

584.    The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Magbag Wellness, the provision of false, fraudulent, and unnecessary healthcare services to Magbag Wellness patients, and the creation and submission to Allstate of false medical documentation that materially misrepresented Magbag Wellness's reimbursement eligibility.

585.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make payments to (or for the benefit of) Magbag Wellness as a result of the Count IV Defendants' unlawful conduct described herein.

586.    By virtue of the Count IV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Magbag East Enterprise)
### (Against GHHS, Dr. Magbag, and Vi Tran)

587.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-500 as if set forth fully herein.

588.    Magbag East constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

589.    In connection with each of the claims identified in the within Complaint, GHHS, Dr. Magbag, and Vi Tran (collectively, the "Count V Defendants") intentionally caused to be prepared and mailed false medical documentation by Magbag East, or knew that such false medical documentation would be mailed in the ordinary course of Magbag East business, or should have reasonably foreseen the mailing of such false documentation by Magbag East and/or by a personal

injury attorney on behalf of a patient of Magbag East would occur, in furtherance of the Count V Defendants' scheme to defraud.

590.    The Count V Defendants worked together to advance the alleged racketeering operation.

591.    Defendant, Dr. Magbag owned, operated and controlled Magbag East.  He created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all, to support the medical treatment ordered by Magbag East.

592.    Vi Tran made referrals to Magbag East to allow it to fulfill its role in the unlawful fraud scheme and extract monies from Allstate.

593.    Defendants GHHS, Dr. Magbag, and Vi Tran, in relation to Magbag East, participated in an improper and unlawful patient referral scheme wherein the Defendants, GHHS, Dr. Magbag, and Vi Tran referred patients to Magbag East in exchange of payment, in cash or in kind.

594.    Had Defendants, GHHS, Dr. Magbag, and Vi Tran chosen not to participate in the referral scheme with Magbag East, then Magbag East would not have been able to submit false records and invoices to the Allstate claimants as is set out in Exhibits 19-20.

595.    The objective of the Magbag East Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

596.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate by submitting false medical documentation though the U.S. Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

597.    The Count V Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

598.    Allstate would not have allocated payments for the Defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

599.    The Count V Defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 12.

600.    The Count V Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Magbag East, which they knew would be billed by Magbag East, and submitted to Allstate by Magbag East and/or by a personal injury attorney, in order to collect payment from Allstate.

601.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Magbag East for the benefit of the Count V Defendants that would not otherwise have been made.

602.    The Count V Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V Defendants to continue this unlawful scheme without being detected.

603.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

604.    The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Magbag East for the benefit of the Count V Defendants.

605.    The Count V Defendants participated in the conduct of the Magbag East enterprise through a pattern of racketeering activities.

606.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

607.    The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

608.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Texas.

609.    By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**<u>COUNT VI</u>**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Magbag East Enterprise)**
**(Against GHHS, Dr. Magbag, and Vi Tran)**

610.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-500 as if set forth fully herein.

611.    GHHS, Dr. Magbag, and Vi Tran (collectively, the "Count VI Defendants") conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Magbag East.

612. The Count VI Defendants worked together to advance the alleged racketeering operation.

613. Defendant, Dr. Magbag owned, operated and controlled Magbag East. He created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all, to support the medical treatment ordered by Magbag East.

614. Vi Tran made referrals to Magbag East to allow it to fulfill its role in the unlawful fraud scheme and extract monies from Allstate.

615. Defendants GHHS, Dr. Magbag, and Vi Tran, in relation to Magbag East, participated in an improper and unlawful patient referral scheme wherein the Defendants, GHHS, Dr. Magbag, and Vi Tran, referred patients to Magbag East in exchange of payment, in cash or in kind.

616. Had Defendants, GHHS, Dr. Magbag, and Vi Tran chosen not to participate in the referral scheme with Magbag East, then Magbag East would not have been able to submit false records and invoices to the Allstate claimants as is set out in Exhibits 19-20.

617. The objective of the Magbag East Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

618. The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate by submitting false medical documentation though the U.S. Mail to induce Allstate to rely on the Defendants misrepresentations to make payments.

619. The Count VI Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

620.    The Count VI Defendants predicate acts themselves create a threat of continued unlawful activity extending into the future.

621.    Allstate would not have allocated payments for the Defendants' medical bills if it knew that the Defendants' medical documentation was fraudulent.

622.    The Count VI Defendants agreed to further, facilitate, support, and operate the Magbag East enterprise.

623.    As such, the Count VI Defendants conspired to violate 18 U.S.C. § 1962(c).

624.    The purpose of the conspiracy was to obtain payments from Allstate for healthcare services provided to patients through Magbag East, even though Magbag East was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count VI Defendants.

625.    The Count VI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Magbag East, the provision of false, fraudulent, and unnecessary healthcare services to Magbag East patients, and the creation and submission to Allstate of false medical documentation that materially misrepresented Magbag East's reimbursement eligibility.

626.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make payments to (or for the benefit of) Magbag East as a result of the Count VI Defendants' unlawful conduct described herein.

627.    By virtue of the Count VI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Brain Diagnostics Enterprise)
### (Against GHHS, Dr. Magbag, and Vi Tran)

628.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-500 as if set forth fully herein.

629.    Brain Diagnostics constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

630.    In connection with each of the claims identified in the within Complaint, GHHS, Dr. Magbag, and Vi Tran (collectively, the "Count VII Defendants"), through Brain Diagnostics, intentionally caused to be prepared and mailed false medical documentation by Brain Diagnostics, or knew that such false medical documentation would be mailed in the ordinary course of Brain Diagnostics, or should have reasonably foreseen the mailing of such false documentation by Brain Diagnostics and/or by a personal injury attorney on behalf of a patient of Brain Diagnostics would occur, in furtherance of the Count VII Defendants' scheme to defraud.

631.    The Count VII Defendants worked together to advance the alleged racketeering operation.

632.    Defendant, Dr. Magbag owned, operated and controlled Brain Diagnostics.  GHHS, Dr. Magbag and Vi Tran engaged in an improper and unlawful referral scheme with Defendant Brain Diagnostics wherein kickbacks were paid in exchange for medically unnecessary medical treatment.

633.    Vi Tran made referrals to Brain Diagnostics to allow it to fulfill its role in the unlawful fraud scheme and extract monies from Allstate.

634.    Had Defendants, GHHS, Dr. Magbag, and Vi Tran chosen not to participate in the referral scheme with Brain Diagnostics, then Brain Diagnostics would not have been able to profit

from false records and invoices submitted by Brain Diagnostics to Allstate as is set out in Exhibit 21.

635.    The objective of the Brain Diagnostics Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

636.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate by submitting false medical documentation though the U.S. Mail to induce Allstate to rely on the defendants misrepresentations to make payments.

637.    The Count VII Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

638.    Allstate would not have allocated payments for the Defendants' medical bills if it knew that the defendants' medical documentation was fraudulent.

639.    The Count VII Defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 13.

640.    The Count VII Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Dr. Magbag at Brain Diagnostics, after an unlawful and unnecessary referral from GHHS and Vi Tran, which they knew would be billed and submitted to Allstate by Brain Diagnostics and/or by a personal injury attorney on behalf of a patient of Brain Diagnostics, in order to collect payment from Allstate.

641.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Brain Diagnostics for the benefit of the Count VII Defendants that would not otherwise have been made.

642.    The Count VII Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII Defendants to continue this unlawful scheme without being detected.

643.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

644.    The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Brain Diagnostics for the benefit of the Count VII Defendants.

645.    The Count VII Defendants participated in the conduct of the Brain Diagnostics Enterprise through a pattern of racketeering activities.

646.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII Defendants' conduct.

647.    The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

648.    Allstate (and all Plaintiffs individually) is in the business of writing insurance and paying claims in the State of Texas.

649.    By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three times the damages sustained by reason of the claims submitted by them,

and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT VIII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Brain Diagnostics Enterprise)**
**(Against GHHS, Dr. Magbag, and Vi Tran)**

650.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-500 as if set forth fully herein.

651.    GHHS, Dr. Magbag, and Vi Tran (collectively, the "Count VIII Defendants") conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Brain Diagnostics.

652.    Defendant, Dr. Magbag owned, operated and controlled Brain Diagnostics. GHHS, Dr. Magbag, and Vi Tran engaged in an improper and unlawful referral scheme with Brain Diagnostics wherein kickbacks were paid in exchange for medically unnecessary medical treatment.

653.    Vi Tran made referrals to Brain Diagnostics to allow it to fulfill its role in the unlawful fraud scheme and extract monies from Allstate.

654.    Had Defendants, GHHS, Dr. Magbag, and Vi Tran chosen not to participate in the referral scheme with Brain Diagnostics, then Brain Diagnostics would not have been able to profit from false records and invoices submitted to the Allstate claimants as is set out in Exhibit 21.

655.    The objective of the Brain Diagnostics Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

656.    The mail fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate by submitting false medical documentation though the U.S. Mail to induce Allstate to rely on the Defendants misrepresentations to make payments.

657.    The Count VIII Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

658.    The Count VIII Defendants predicate acts themselves create a threat of continued unlawful activity extending into the future.

659.    Allstate would not have allocated payments for the Defendants' medical bills if it knew that the Defendants' medical documentation was fraudulent.

660.    The Count VIII Defendants agreed to further, facilitate and support Brain Diagnostics through unnecessary and unlawful referrals.

661.    As such, the Count VIII Defendants conspired to violate 18 U.S.C. § 1962(c).

662.    The purpose of the conspiracy was to obtain payments from Allstate for healthcare services provided to patients through Brain Diagnostics even though Brain Diagnostics was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count VIII Defendants.

663.    The Count VIII Defendants agreed that Dr. Magbag would operate and control Brain Diagnostics for the purpose of providing false, fraudulent, unlawful, and unnecessary healthcare services to Brain Diagnostics' patients, and for the purpose of creating and submitting to Allstate false medical documentation that materially misrepresented Brain Diagnostics' reimbursement eligibility.

664.    The Count VIII Defendants, GHHS and Vi Tran were aware of this purpose and agreed to facilitate Dr. Magbag and would take steps to meet the conspiracy's objectives, by making unlawful and unnecessary referrals to Brain Diagnostics.

665.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make payments to (or for the benefit of) Brain Diagnostics as a result of the Count VIII Defendants' unlawful conduct described herein.

666.    By virtue of the Count VIII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of the suit, including reasonable attorney's fees.

## COUNT IX
### COMMON LAW FRAUD
### Against All Defendants

667.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-500 as if set forth fully herein.

668.    The scheme to defraud perpetrated by GHHS, Magbag Wellness, Magbag East, Brain Diagnostics, Dr. Magbag, Dr. Alan Tran, and Vi Tran (collectively, the "Count IX Defendants") was dependent upon a succession of material misrepresentations of fact that the Count IX Defendants were actually and lawfully rendering medically necessary treatment and services and were entitled to collect payments from Allstate.

669.    The false representations made by the Count IX Defendants include, but are not limited to, those discussed in the medical documentation submitted to Allstate concerning the legitimacy of healthcare services purportedly provided to Allstate claimants, and the actual ownership and control of GHHS, Magbag Wellness, Magbag East, and Brain Diagnostics.

670. The Count IX Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

671. The misrepresentations were intentionally made by the Count IX Defendants in furtherance of their scheme to defraud and deceive Allstate by submitting, causing to be submitted, and/or knowing that fraudulent claims for payment would be submitted to Allstate.

672. The Count IX Defendants' misrepresentations were known by them to be false, or were made in reckless disregard of the truth, and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Texas law.

673. Allstate justifiably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by and on behalf of the Count IX Defendants.

674. As a direct and proximate result of the Count IX Defendants' fraudulent representations and acts, Allstate has been damaged as previously described herein.

### COUNT X
### CIVIL CONSPIRACY TO COMMIT FRAUD
### Against All Defendants

675. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-500 as if set forth fully herein.

676. GHHS, Magbag Wellness, Magbag East, Brain Diagnostics, Dr. Magbag, Dr. Alan Tran, and Vi Tran (collectively, the "Count X Defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment to which they were not entitled because (1) the Count X Defendants participated in a unlawful referral scheme; (2) the Count X did not lawfully provide the services billed to Allstate; (3) the Count X Defendants did

not provide reasonably necessary services; (4) the Count X Defendants did not lawfully render services; and (5) the Count X Defendants engaged in fraudulent billing practices.

677.    The Count X Defendants formed a meeting of the minds and worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

678.    This purpose was known to all of the Count X Defendants and intentionally pursued by them.

679.    The Count X Defendants committed unlawful and overt acts by billing Allstate for services that were not actually provided as represented, were not reasonably necessary, were not lawfully rendered, were fraudulently billed, and by creating and disseminating false medical documentation to accompany their fraudulent bills.

680.    In reasonable reliance on the false medical documentation submitted by the Count X Defendants, Allstate paid certain of the claims submitted.

681.    All of the Count X Defendants directly benefited from the payments made to GHHS, Magbag Wellness, Magbag East, and Brain Diagnostics.

682.    All of the Count X Defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count X Defendants in the commission of acts done for the benefit of all Count X Defendants and to the unjustified detriment of Allstate.

683.    Accordingly, all of the Count X Defendants are jointly and severally liable for the fraud perpetrated on Allstate by each other defendant pursuant to their conspiracy.

## COUNT XI
### MONEY HAD AND RECEIVED
### Against All Defendants

684.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-500 as if set forth fully herein.

116

685.    GHHS, Magbag Wellness, Magbag East, Brain Diagnostics, Dr. Magbag, Dr. Alan Tran, and Vi Tran (collectively, the "Count XI Defendants") submitted claims to Allstate that caused Allstate to pay money based upon a reasonable belief in the veracity of the Count XI Defendants' medical records and bills.

686.    The Count XI Defendants wrongfully obtained and benefited from payments from Allstate through the fraudulent scheme detailed herein.

687.    Services billed by the Count XI Defendants that were not actually provided as represented, were not reasonably necessary, were not lawfully rendered, or were fraudulently billed had no value.

688.    Money that the Count XI Defendants obtained from Allstate for goods and services that were not actually provided as represented, were not reasonably necessary, were not lawfully rendered, or were fraudulently billed belongs to Allstate in equity and good conscience, and should be returned to Allstate.

689.    The Count XI Defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

<u>**COUNT XII**</u>
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**(Against GHHS, Magbag Wellness, Magbag East, and Brain Diagnostics)**

690.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-500 as if set forth fully herein.

691.    GHHS, Magbag Wellness, Magbag East, and Brain Diagnostics (collectively, the "Count XII Defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

692.    The Count XII Defendants also billed for services not rendered.

693.    Pursuant to Texas law, an insurer is liable to pay only for reasonable and necessary expenses arising out of a motor vehicle accident. *In re Allstate Indem. Co.*, 622 S.W.3d 870, 876 (Tex. 2021); *Havgood v. De Escabedo*, 356 S.W.3d 390, 391 (Tex. 2011).

694.    Moreover, a "health care provider commits unprofessional conduct if the health care provider . . . knowingly presents or causes to be presented a false or fraudulent claim for the payment of a loss under an insurance policy." Tex. Occ. Code § 105.002(a)(1).

695.    Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

696.    The Count XII Defendants submitted, continue to submit, and cause to be submitted claims for unnecessary and/or unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

697.    The Count XII Defendants will continue to submit and cause to be submitted claims to Allstate absent a declaration by this Court that their activities are unlawful and that Allstate has no obligation to pay pending and previously-denied claims submitted by or on behalf of any of the Count XII Defendants.

698.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XII Defendants billed for unlawful and medically unnecessary services that are not compensable under Texas law.

699.    Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XII Defendants were engaged in a fraudulent scheme

whereby they billed for fraudulent, unnecessary, and unlawful services, and submitted unreasonable charges for the same to Allstate at all relevant times.

700.    As such, the Count XII Defendants have no standing to submit, pursue, or receive benefits, or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XII Defendants cannot seek payment from Allstate for benefits under any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

701.    Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XII Defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## X.    DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate County Mutual Insurance Company, respectfully pray that judgment enter in their favor, as follows:

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (GHHS Enterprise)
### (Against Jose Magbag, D.C., Alan Tran, D.C., Vi Tran, CNP, Magbag Wellness, Magbag East, and Brain Diagnostics)

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)
## (GHHS Enterprise)
## (Against Jose Magbag, D.C., Alan Tran, M.D., Vi Tran, CNP, Magbag Wellness, Magbag East, and Brain Diagnostics)

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
## (Magbag Wellness Enterprise)
## (Against GHHS, Dr. Magbag, and Vi Tran)

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Magbag Wellness Enterprise)
### (Against GHHS, Dr. Magbag, and Vi Tran)

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Magbag East Enterprise)
### (Against GHHS, Dr. Magbag, and Vi Tran)

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Magbag East Enterprise)
### (Against GHHS, Dr. Magbag, and Vi Tran)

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Brain Diagnostics Enterprise)
### (Against GHHS, Dr. Magbag, and Vi Tran)

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Brain Diagnostics Enterprise)
### (Against GHHS, Dr. Magbag, and Vi Tran)

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT IX**
**COMMON LAW FRAUD**
**Against All Defendants**

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

**COUNT X**
**CIVIL CONSPIRACY TO COMMIT FRAUD**
**Against All Defendants**

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

**COUNT XI**
**MONEY HAD AND RECEIVED**
**Against All Defendants**

(a)    AWARD Allstate restitution in an amount to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

## COUNT XII
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### (Against GHHS, Magbag East, Magbag Wellness, and Brain Diagnostics)

(a)    DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by GHHS, Magbag East, Magbag Wellness, and Brain Diagnostics;

(b)    DECLARE that GHHS, Magbag East, Magbag Wellness, and Brain Diagnostics cannot seek payment from Allstate (or any Allstate claimant) pursuant to any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)    DECLARE that GHHS, Magbag East, Magbag Wellness, and Brain Diagnostics cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)    GRANT such other relief as this Court deems just and appropriate under Texas law and the principles of equity.

### JURY TRIAL DEMAND

The plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate County Mutual Insurance Company, demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

KING, TILDEN, MCETTRICK & BRINK, P.C.

*/s/ Nathan A. Tilden*

_____

Nathan A. Tilden
ntilden@ktmpc.com
Douglas D. McInnis
dmcinnis@ktmpc.com
350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Indemnity Company,*
*Allstate Property & Casualty Insurance Company,*
*Allstate Fire & Casualty Insurance Company, and*
*Allstate County Mutual Insurance Company*

Dated: October 27, 2025

## CERTIFICATE OF SERVICE

I, Nathan A. Tilden, hereby certify that on October 27, 2025, I did file via CM/ECF the **Plaintiffs' Complaint and Demand for Jury Trial.** I hereby certify that, upon issuance of the Summons by the Court, the Complaint and related documents will be served in accordance with Federal Rule of Civil Procedure 4 upon the following defendants:

| **Greater Houston Healthcare Solutions, PLLC,**<br>**Brain Diagnostics of Texas LLC**<br><br>c/o Registered Agent:<br>Jose Magbag, Jr. D.C.<br>10723 Schroeder Oak Ct<br>Houston, TX 77070 | **Jose Sebastian Magbag, Jr. D.C.,**<br>**Magbag Wellness and Rehab, P.A.,**<br>**Magbag Chiropractic East, P.A.**<br><br>c/o Registered Agent:<br>Jose Magbag, Jr. D.C.<br>12210 Marcrest Ct.<br>Houston, TX 77070 |
|---|---|
| **Vi Yen Chau-Tran, APRN-CNP**<br>5522 Loch Lomond Dr<br>Houston, TX 77096 | **Alan Dinh Tran, M.D.**<br>22 E Shady Ln<br>Houston, TX 77063 |

Date: October 27, 2025

/s/ Nathan A. Tilden

_____

Nathan A. Tilden

126